Charles Field (SBN 189817)
SANFORD HEISLER SHARP MCKNIGHT
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 577-4252
Email: cfield@sanfordheisler.com

*Attorneys for Plaintiff*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

10/23/2024 12:05:13 PM

Clerk of the Superior Court
By N. Argamosa    ,Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN DIEGO**

**NORTH COUNTY DIVISION**

| | |
|---|---|
| **GABERIK HOLM, individually, and on behalf of all others similarly situated,**<br><br>Plaintiff,<br><br>v.<br><br>**ACIMA CREDIT DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA CREDIT LEASING)**<br><br>Defendant. | **CASE NO.:**  24CU019677N<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

CLASS ACTION COMPLAINT

Gaberik Holm, a United States Marine Corporal, on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this class action against Acima Credit Digital, LLC (F/K/A Acima Credit, LLC, D/B/A Acima Credit Leasing) ("Acima Credit" or "Defendant") and alleges as follows:

## I.    NATURE OF THE ACTION

1.      This Complaint seeks to protect active-duty military service members from Acima Credit's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, et seq. ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Borrowers") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Acima Credit makes no effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide legally mandated protections for them.

2.      Acima Credit's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory Military Annual Percentage Rate (MAPR) cap; (2) failing to provide any required MLA Disclosures; (3) including a Class Action Ban and Waiver of Jury Trial; and (4) including a mandatory binding arbitration clause. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

3.      Acima Credit systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

4.      Corporal Holm took out a loan from Acima Credit to pay for one-time services of tire alignment and *labor* for installing a starter. Obviously, these are services, not products. Nevertheless, Acima Credit charged him an MAPR[1] on the loan of *over 125%*. Corporal Holm's

---

[1] MAPR is the Military Annual Percentage Rate which is like an APR except it includes additional fees such as credit insurance premiums, finance charges, and add-on credit related

(continued…)

Loan Agreement included a class action waiver and an arbitration provision and did not provide the required MLA disclosures. The loan agreement with Acima Credit ("Loan Agreement") is attached hereto as Exhibit 1. Exhibit 1 is a form agreement which is substantially similar to all consumer credit agreements used by Acima Credit.

5.    Among the abusive lending practices that the MLA was designed to curb was the mischaracterization of credit as "rent-to-own" leases.[2] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the rent-to-own industry were highlighted.[3] Rent-to-own programs often serve consumers who may not otherwise qualify for a credit purchase to buy goods and services they could not otherwise afford under the auspices of a rental arrangement with a purchase option.[4] The individuals patronizing the rent-to-own industry are "among the poorest consumers."[5] In a typical rent-to-own transaction—as was the case with Corporal Holm—vulnerable consumers end up paying triple digit interest rates in transactions that operate exactly like credit transactions.

6.    Acima's rent-to-own agreements made to Corporal Holm and other Covered Borrowers for one-time, contemporaneously performed services are a sham. Corporal Holm will not "own" the "tire alignment" or "labor for starter" at the end of the one-year purported lease term with Acima Credit, because of course he won't: Simply put, there is *nothing to own*. Obviously, you cannot "own" the service of aligning tires or installing a starter. Rather, Acima Credit extended him credit for those one-time services and charged him over 125% in interest on that credit. And these "rent-to-own" agreements are misleadingly labeled, and provided to those who need the service but are unable to understand or do not have the time to read the fine print.

---

products. It is calculated by dividing the total finance charge for the billing cycle by the balance to which it applies and then multiplying the quotient by the number of billing cycles in a year.
[2] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf
[3] *Id.*
[4] *Id.*
[5] *Id.*

CLASS ACTION COMPLAINT

1    There is a reason Congress forbade these abusive practices—and it is the same reason those who

2    ignore such dictates should be held to account.

3        7.    Acima Credit's business practices violate the MLA and TILA and are part of a

4    systematic nationwide policy and practice. Corporal Holm seeks to hold Acima accountable for

5    its actions and prevent Acima's predatory lending practices from continuing in the future.

6                        **II.    JURISDICTION AND VENUE**

7        8.    This Court has personal jurisdiction over Defendant because Defendant conducts

8    business in this State and the actions giving rise to this complaint occurred in this jurisdiction.

9    Defendant has sufficient minimum contacts in California and intentionally avails itself of the

10   California market so as to render the exercise of jurisdiction over it by California courts

11   consistent with traditional notions of fair play and substantial justice.

12       9.    This Court has general subject matter jurisdiction pursuant to California

13   Constitution Article VI, Section 10.

14       10.    The acts and omissions complained of in this action took place, in whole or in

15   part, in San Diego County. Additionally, Defendant's Loan Agreement states: "Governing Law,

16   Venue: This Agreement is governed by the laws of the state where you live." Corporal Holm

17   lives in California. This Court has jurisdiction over Defendant because Defendant is registered to

18   conduct business in California—and does indeed conduct business within San Diego County—

19   has sufficient minimum contacts in California, or otherwise intentionally avails itself of the

20   markets within California through promotion, sales, marketing, and distribution of its so-called

21   Lease Agreements in California, to render the exercise of jurisdiction by this Court proper and

22   necessary.

23       11.    Venue is proper in this County because Corporal Holm resides in San Diego

24   County, and the acts and omissions complained of herein occurred, inter alia, in San Diego

25   County. Further Defendant's Loan Agreement with Corporal Holm states: "Venue for any

26   dispute arising out of this Agreement will be the county where you live."

27

28

CLASS ACTION COMPLAINT

### III.    PARTIES

12.    At all times relevant, Corporal Holm was a natural person and citizen of San Diego County, California. He has been a member of the United States Marines Corps since June 2022.

13.    During the class period, Corporal Holm was a Covered Borrower and an active-duty service member employed by the United States Marines.

14.    Defendant Acima Credit Digital, LLC,[6] which currently conducts business as Acima Credit Leasing (which is not a registered legal entity), is a limited liability company formed in Utah and has its principal place of business at 5501 Headquarters Drive, Plano TX 75024. Acima Credit was formerly known as Acima Credit LLC; Simple Leasing; Simple Finance, LLC; and Simple RTO, LLC.

15.    Acima Credit has offered Loan Agreements to consumers, including Covered Borrowers, since at least 2015, entering into millions of credit transactions.

### IV.    OVERVIEW OF THE LAWS AT ISSUE

#### a.    The Military Lending Act

16.    The Military Lending Act, codified at 10 U.S.C. § 987, was enacted in 2006 in the wake of investigations conducted by the Department of Defense (DoD), which revealed rampant predatory lending targeted at military families. In its Report,[7] the DoD uncovered numerous predatory financial schemes targeting military families that posed a substantial risk to national security, including that high interest loans often leave Covered Members with "enormous debt, family problems, difficulty maintaining personal readiness[,] and a tarnished career."[8]

17.    The Report identified serious issues with creditors and predatory lenders offering consumer credit products featuring high fees and/or interest rates.[9]

---

[6] Acima Credit changed its name to Acima Credit Digital in December 2021.
[7] https://apps.dtic.mil/sti/pdfs/ADA521462.pdf
[8] *Id.*
[9] Dr. William O. Brown, Jr., and Dr. Charles B. Cushman, Jr., "Payday Loan Attitudes and Usage Among Enlisted Military Personnel," Consumer Credit Research Foundation, June 27, 2006, p. 10

CLASS ACTION COMPLAINT

18.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness. Congress answered the call and passed the MLA to protect Covered Borrowers from unfair, deceptive, and excessively priced loans.

19.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

20.     The MLA also requires mandatory disclosures in "consumer credit"[10] transactions with Covered Borrowers, which include:

    a.  A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

    b.  Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

    c.  A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

21.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

22.     The MLA also makes it unlawful to charge a Covered Borrower any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

**b.  The Truth in Lending Act**

23.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, inter alia, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory

---

[10] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

24.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Acima Credit participates in here. Acima Credit fails to make any of the following required disclosures:

a.  "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

b.   "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

c.   "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

d.  "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

e.  "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

f.  "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

g.  "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

h.  "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

i.  "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right

CLASS ACTION COMPLAINT

1    to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.*

2    at § 1638(12).

3                                **V.    FACTS**

4    **a.  Corporal Holm's Loan**

5    25.    Corporal Holm is currently an active duty Marine stationed at Camp Pendleton in

6    California.

7    26.    He has been an active duty servicemember since June of 2022 and will remain on

8    active duty until at least June of 2026.

9    27.    Acima Credit extended Corporal Holm a loan in 2024 for "tire alignment" and

10   "labor for [a] starter"; more specifically the services included a vehicle inspection, tire recycling,

11   wheel balance, wheel weights, vehicle alignment, labor, and vehicle technology inspection. See

12   Ex. 2.

13   28.    The cost of the services amounted to $1,024.94.

14   29.    To finance the loan, Acima entered into an agreement with Corporal Holm

15   requiring him to make 24 installment payments of $96.09 each ("Renewal Payments"), totaling

16   $2,306.16 over the life of the loan. The cost of financing the vehicle service ("Finance Charge")

17   amounted to $1,281.18 - more than double the cost of the services being financed. The term of

18   the loan was one year.

19   30.    Acima Credit's loan to Corporal Holm carried an interest rate of 125%, nearly

20   quadruple the MLA's statutory rate cap of 36%. 10 U.S.C. § 987(b).

21   31.    Acima Credit extended Corporal Holm's Loan via its standard form Loan

22   Agreement on August 31, 2024. The loan is to be paid within 365 days over 24 payments.

23   32.    Further, Acima Credit's Loan Agreement required Corporal Holm to purportedly

24   waive his right to a jury trial and waive his right to participate in a class action in violation of 10

25   U.S.C. § 987(e)(2).

26   33.    Acima Credit's Loan Agreement failed to include mandatory MLA loan

27   disclosures in violation of 10 U.S.C. § 987(c).

28

CLASS ACTION COMPLAINT

**b. Acima Credit's Business**

34.    Since at least 2015, Acima Credit has partnered with merchants across various industries to offer consumers with financing through loan agreements disguised as "rent-to-own" agreements. Acima Credit is a third party to these transactions and provides financing similar to a credit card company or lender.

35.    Notably, Acima Credit has partnered with auto repair merchants to offer and provide financing through Loan Agreements for one-time auto repairs and services (engine repairs, transmission repairs, A/C system repairs, collision repairs, speaker installation, car detailing, etc.) for which consumers' scheduled payments are not contemporaneous or substantially contemporaneous with the value received. Such one-time services are incapable of being surrendered, possessed, or recalled. They cannot be leased, only purchased.

36.    Acima Credit extends financing for the purchase of these services.

37.    In a ham-handed effort to evade liability under laws governing the extension of credit, Acima Credit calls its credit transactions "leases."

38.    As evidenced by its own characterizations, Acima Credit is not designed to be a leasing company, but rather a financing company. Acima Credit characterizes itself as a "revolutionary digital platform bring[ing] customers and retail partners together,"[11] meaning it does not carry an inventory of goods. Rather, it is a third party to consumers' transactions with retailers. Acima Credit partners with over 15,000 retailers nationwide.[12]

39.    Rather than describe periodic payments as "renewal payments" or "rent," as its Loan Agreements did, Acima Credit refers to them on its website as "flexible payments."[13]

---

[11] *Acima is the future of lease-to-own shopping solutions*, https://www.acima.com/digital (accessed Oct. 2, 2024).

[12] Acima Credit, *Get Approved and Start Shopping Nearby Stores Today*, https://www.AcimaCredit.com/find-a-store#:~:text=Choose%20from%20over%2015%2C000%20retail,goods%20at%20your%20selected%20merchant (last accessed Sept. 14, 2024).

[13] Acima, Lease Now, *Buy Later: Unlocking Shopping Power with Acima Leasing*, https://www.acima.com/blog/lease-now-buy-later-with-acima-leasing (accessed Oct. 2, 2024).

CLASS ACTION COMPLAINT

Acima Credit also tells retailers that partnering with Acima Credit will result in "Up to 2x ticket size."[14]

40.    In 2019 Acima Credit began promising consumers "approvals," and representing they could get "up to $5,000" or other certain sums of money "with quick, simple financing in minutes."[15] This gave the correct impression that consumers would be borrowing money from Acima Credit, rather than renting merchandise from it:



*Figure 1*

41.    Indeed, Acima Credit finances services that cannot possibly be leased, such as auto repairs, oil changes, and delivery services. Take one example from an Ohio auto store:

## ACIMA LEASING

Need a way to lease tires, wheels, or tire services? Ask about Acima Leasing, the provider of No Credit Needed solutions that make purchases more affordable. Enjoy low monthly payments spread out over time that let you stay in budget and drive home with what you need.

Katz Tires accepts Acima Leasing at our locations serving Columbus, OH, Blacklick Estates, OH, Bexley, OH, and surrounding areas. We also offer other financing solutions at our stores. Ask an associate for more information on all available financing options.

---

[14] Acima, *The Acima Experience*, https://www.acima.com/en/ecommerce (accessed Oct. 2, 2024).

[15] Acima continues to make the same representations on its website. *See* Acima, *Acima puts what you need within reach*, https://www.acima.com/how-it-works (accessed Oct. 2, 2024).



*Figure* 2

42.      Here, Acima Credit extended to Corporal Holm for the 'Property' defined below:

Agreement including, but not limited to, the Optional Liability Damage Waiver and Acima Benefits Plus. "Property" means the item(s) that are the subject matter of this Agreement; specifically, the **NEW TIRES ALIGNMENT AND LABOR FOR STARTER**.

*Figure* 3

43.      When considering the "Property" here is the service of tire alignment and labor, it is not only nonsensical but also impossible to require Corporal Holm to return his tire alignment and labor in order to terminate his "lease," as Acima Credit requires in its Loan Agreement. Exhibit 1, p. 5, ¶ 10.

44.      Additionally, the Loan Agreement states "WE OWN THE PROPERTY…You do not have the right to keep the Property if you do not make timely Renewal Payments." Exhibit 1. In the context of labor for a tire alignment and to install a starter, there is nothing to own.

45.      Similarly, consider Acima Credit's "Right of Repossession" referenced in the Loan Agreement, by which Acima Credit has the "right to repossess the Property" if Corporal

CLASS ACTION COMPLAINT

Holm or a putative class member breaches their contract. How would Acima Credit possibly repossess a tire alignment or labor for replacing a starter, or an oil change, seasonal tire installation, or other sundry auto repairs? It can't. These transactions are, in substance, financing for services.

46.    Acima Credit's Loan Agreements are clearly extensions of credit to which the MLA and the TILA apply.

47.    Because Acima Credit's transactions are not leases but rather credit transactions or loans, all "rental fees" that it charges are simply interest.

**c.    Acima Credit Violates the MLA and the TILA**

48.    The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR.  "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

49.    A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

50.    Corporal Holm and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

51.    Corporal Holm is a Covered Borrower with respect to his Loan Agreement with Acima Credit because he took out the loan while an active-duty service member for personal, family or household purposes.

52.    Acima Credit is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Borrowers. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

53.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered

or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

54.    Acima Credit violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any required MLA Disclosures; (3) including a Class Action Ban and Waiver of Jury Trial which is prohibited by the MLA; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. § 987(b),(c),(e)(2)(6)(7).

   *i.    Acima Credit Charges Well Beyond the 36% MLA Interest Cap*

55.    The MLA prohibits creditors from charging Covered Borrowers above a 36% MAPR.

56.    Computing the MAPR in closed-end credit is calculated following the rules for calculating and disclosing the "Annual Percentage Rate (APR)" for credit transactions under Regulation Z based on the charges set forth in paragraph (c)(1) of 32 C.F.R. § 232.4.

57.    To calculate MAPR, a creditor must start with the APR calculation and include: (1) any amount financed, finance charges, and processing fees associated with the application of a loan; and (2) any fee for a credit-related ancillary product sold in connection with the credit transaction for closed-end credit. 32 C.F.R. Section 232.4(c).

58.    Acima Credit did not disclose Corporal Holm's 125% MAPR in the Loan Agreement.

59.    Acima Credit's loan to Corporal Holm violated the MLA's usury cap.

60.    Accordingly, all of Acima Credit's loan agreements to Class Members that contain an MAPR that exceeds 36% violate the MLA.

   *ii.    Acima Credit's Additional MLA and TILA violations.*

61.    The MLA, as relevant here, requires that the Loan Agreement include a statement of the MAPR and all disclosures required under the TILA. 15 U.S.C. § 1638.

62. Corporal Holm's standard form Loan Agreement does not contain any "Statement of MAPR" either in the form of the charges necessary to calculate the MAPR or through the inclusion of the MLA Model Statement. Exhibit 1.

63. Further, at the time of the extension of consumer credit, none of Acima Credit's standard form Loan Agreements contained any "Statement of MAPR" either in the form of the charges necessary to calculate the MAPR or through the inclusion of the MLA Model Statement.

64. Acima Credit violates the MLA and its implementing regulations by extending consumer credit without the aforementioned required MLA disclosures. 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a) & (c); 32 C.F.R. § 232.6(c)(3).

65. At the time of the extension of consumer credit, in all of Corporal Holm's and the Class Members' loans, Acima Credit's standard form Loan Agreements failed to contain the aforementioned required MLA disclosures.

66. As a result of Acima Credit's failure to provide all mandatory MLA disclosures, Acima Credit violated the MLA and the TILA.

67. Acima Credit also violates the MLA by including arbitration clauses, class action waivers and jury trial waivers in its Loan Agreements. The MLA specifically prohibits the inclusion of such clauses in agreements to extend credit to Covered Borrowers. 10 U.S.C. § 987(e)(2)–(3).

**TOLLING**

68. The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 et seq., tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Corporal Holm, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in
> computing any period limited by law, regulation, or order for the bringing of any
> action or proceeding in a court, or in any board, bureau, commission, department,
> or other agency of a State (or political subdivision of a State) or the United States

by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## CLASS ALLEGATIONS

69. Corporal Holm seeks to represent two classes of individuals pursuant to Cal. Civ. Proc. Code § 382.

70. Corporal Holm seeks to represent the "MLA Class" and the "TILA Class" (collectively the "Classes"). Corporal Holm brings this action individually and on behalf of classes of which he is a member and initially defined:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into a loan agreement with Acima Credit in substantially the same form as Exhibit 1.

**TILA Class**: All individuals in the United States that entered into a Loan Agreement in substantially the same form as Exhibit 1.

71. Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Acima Credit and any entity in which Acima Credit has a controlling interest, or which has a controlling interest in Acima Credit, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

72. Corporal Holm reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

73. **Numerosity**. Acima Credit's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

74. The exact number of Class members is unknown, but Acima Credit has made millions of loans, and Corporal Holm estimates there are, at least many thousands of consumers in the MLA Class and TILA Class as Acima Credit has issued thousands of loans to members of the Classes in a manner that violates the MLA and TILA.

75. **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Corporal Holm and Class members.

76. The harm that Acima Credit has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a. Whether Corporal Holm and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

b. Whether Acima Credit is a "creditor" subject to the protections and limitations of the MLA;

c. Whether Acima Credit's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d. Whether Acima Credit entered into standard form Loan Agreements with Covered Borrowers;

e. Whether Acima Credit's loans exceed the MLA statutory rate cap of 36% MAPR;

f. Whether Acima Credit failed to provide required MLA disclosure in violation of the MLA;

g. Whether Acima Credit's standard form Loan Agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

h. Whether Acima Credit's standard form Loan Agreements contain an arbitration clause in violation of the MLA;

i. Whether Acima Credit failed to provide required credit disclosures in violation of the MLA and TILA;

j. Whether each month Acima Credit charged interest to Corporal Holm and Class Members it restarted the statute of limitations under the MLA;

k. Whether each month that Corporal Holm and the Class Members paid money to the Acima Credit it restarted the statute of limitations under the MLA;

l.  Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

m.  Whether Acima Credit should be enjoined from continuing its lending practices in the manner challenged herein;

n.  Whether Acima Credit is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Corporal Holm and the Class are entitled under 10 U.S.C. § 987(f)(5); and

o.  Any declaratory and/or injunctive relief to which the Classes are entitled.

77.  **Typicality**. The claims and defenses of Corporal Holm are typical of the claims and defenses of the MLA Class because Corporal Holm is a Covered Borrower and his Loan Agreement with Acima Credit is typical of the type of personal, household, or family loans that Acima Credit normally provides to Covered Borrowers. Additionally, Acima Credit uses the same or substantially similar standard form Loan Agreements in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Corporal Holm suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about the Plaintiff's claims.

78.  **Adequacy**. Corporal Holm will fairly and adequately assert and protect the interests of the Classes. Corporal Holm has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Corporal Holm has no conflict of interest that will interfere with maintenance of this class action.

79.  **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Acima Credit and could create incompatible standards of conduct;  Adjudications with respect to individual members of the Class members could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the

expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

80.     Acima Credit has acted and refused to act on grounds generally applicable to the MLA Class, thereby making declaratory relief and corresponding final injunctive relief under the California Rules of Civil Procedure appropriate with respect to the Classes. Acima Credit should be enjoined from making loans to Covered Borrowers in violation of the MLA and TILA and a declaration should be made that the loans are void from inception.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

81.     Corporal Holm brings this claim on behalf of himself and the MLA Class and incorporates paragraphs 1-80 by reference.

82.     The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

83.     A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

84.     "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

85.     Corporal Holm and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

86.     Corporal Holm is considered a "Covered Borrower" with respect to his Acima Credit Loan Agreement because Corporal Holm is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

87.     Acima Credit is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

88.     The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

89.     Acima Credit charged Corporal Holm and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

90.     The MLA also makes it unlawful for any creditor to extend consumer credit to a Covered Borrower with respect to which the Covered Borrower is prohibited from prepaying the loan or is charged a penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e)(6).

91.     Acima Credit violates 10 U.S.C. § 987(e)(6) by charging penalties in order to prepay all or part of loans it extends.

92.     Acima Credit fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form Loan Agreements, in violation of the MLA.

93.     Acima Credit's standard form Loan Agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

94.     Acima Credit's standard form Loan Agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

95.     As a result, Acima Credit violates 10 U.S.C. § 987.

## COUNT II
## VIOLATIONS OF THE TRUTH IN LENDING ACT

96.     Corporal Holm brings this claim on behalf of himself the TILA Class and incorporates paragraphs 1-80 by reference.

97.     TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Acima Credit's Loan Agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

98.     Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

99.     Acima Credit is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its Loan Agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

100.     Acima Credit has not provided such disclosures before consummation of the Loan Agreements.

101.     Acima Credit failed to provide such disclosures to Corporal Holm and the TILA Class.

102.     As a result, Acima Credit violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

## **PRAYER FOR RELIEF**

WHEREFORE, Corporal Holm prays that the Court enter an Order:

    A. Certifying this action as a class action as provided by California Rules of Civil Procedure §382, appointing Corporal Holm as Class Representative, and appointing undersigned attorneys and their firms as Class Counsel;

    B. Declaring that Acima Credit violated the MLA and adjudging that Corporal Holm and MLA Class Members' standard form Loan Agreements violate the MLA;

CLASS ACTION COMPLAINT

C. Adjudging that Acima Credit violated the MLA and awarding Corporal Holm and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D. Adjudging that Acima Credit violated TILA and awarding Corporal Holm and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E. Adjudging that Acima Credit violated the MLA and award Corporal Holm and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F. Awarding Corporal Holm and the Classes, reasonable attorneys' fees and costs incurred in this action;

G. Enjoining Acima Credit from continuing to engage in predatory lending practices in violation of the MLA and TILA;

H. Awarding Corporal Holm, and the MLA Class, any pre-judgment and post judgment interest as may be allowed under the law; and

I. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Corporal Holm demands a jury trial on all issues so triable.

Dated: October 23, 2024

*/s/ Charles Field*
Charles Field (SBN 189817)
SANFORD HEISLER SHARP MCKNIGHT
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 577-4252
Email: cfield@sanfordheisler.com

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam (to apply *pro hac vice*)
Edwin Lee Lowther III (to apply *pro hac vice*)
Courtney Ross Brown (to apply *pro hac vice*)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: rpulliam@cbplaw.com
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com

JACOBSON PHILLIPS PLLC
Jacob L. Phillips (to apply *pro hac vice*)
Joshua R. Jacobson (to apply *pro hac vice*)
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057
Email: jacob@jacobsonphillips.com
Email: joshua@jacobsonphillips.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

# EXHIBIT 1



## KNOW YOUR RIGHTS

Here are some of your key rights related to your lease under California law:

### Processing Fee

You were charged a processing fee of $1.00 at the inception of your lease agreement. This fee covers the administrative and other costs associated with the processing of your application and acquisition of merchandise from the retailer for your lease. That amount is not credited as a "rental" payment and will not apply to any purchase option or the total cost to own.

### Canceling your lease

You can cancel your lease without penalty or obligation at any time before you receive the Property. In the event you cancel your lease prior to receiving the property, your processing fee will be refunded to you.

### Terminating your lease

You can terminate your lease at any time without penalty by returning the Property according to our directions, and by paying us any late Renewal Payments, plus Other Charges due.

### Early purchase options

You can purchase the Property outright within 3 months from your lease's start date by paying Acima the Acima Cash Price plus tax, and Other Charges due, minus any periodic rental payments you have made.

After 3 months, you can purchase the Property before the end of the Rental Period by making any payment then due or overdue plus Other Charges due and an amount equal to the cash price in your agreement multiplied by a fraction that has as its numerator the number of periodic payments remaining under the agreement and has, as its denominator, the total number of periodic payments. For example, assume you do not owe any past due payments or owe any fees. Also, assume you have a lease with 12 monthly payments for a product with a cash price of $500 and have made payments for 5 months. You could obtain ownership by paying $500 x 7/12 or $291.66. You are not automatically enrolled in early purchase options. To purchase early call (801) 297-1982 or go to https://customer.acima.com.

### Reinstating your lease after default

If you default on your lease, you can reinstate it without losing any of your rights. All you have to do is pay Acima all of the money you owe, including any late fees. If you still have the merchandise, you must pay any money owed by the end of the 10th day after your payment was due. If you return the merchandise to Acima, you can reinstate the lease by making these payments within one year after your payment was due.

### Reduced payments related to Interruption or Reduction of Income

If you have made at least half of your payments, you may be entitled to a lower payment if your income drops by 25% or more. To qualify for a lower payment, your reduced income must be due to involuntary job loss, involuntary reduced employment, illness, pregnancy, or disability. The amount your payment will be lowered by the lesser of 50% or the percentage of your lost income. For example, if your income has been involuntarily reduced by 30%, your payments would be 30% lower. To acquire ownership of the property, you must still pay the same total cost to own amount, but the lower payments will mean you will pay that amount over a longer time period. You are required to provide proof of the amount and cause of the interruption or reduction of income.

### Possession of the Leased Property in Good Working Order

Acima will maintain your leased property in good working order while your lease is in effect. If your property is not working, Acima will try to repair or replace the property at no charge within 2 business days. If Acima can't repair or replace your property within 2 business days, Acima will provide you with loaner property of comparable quality and condition while we repair the property. If Acima can't repair the property to your reasonable satisfaction within 30 days (or a longer period you agree to), then we will replace the property with comparable property. You will not be charged any rental fee while the property or loaner property provided to you is not working. These obligations do not apply where you damage the property by negligent, reckless, willful, wanton, or intentional conduct.

### Loss or damage to the leased property

You are responsible for loss or damage to the leased property caused by your negligence, reckless conduct or intentional acts. You are not responsible for loss or damage caused by acts of God, such as natural disasters. You are also not responsible when the leased property is stolen if (i) there is evidence of burglary, such as a police report, or (ii) you prove that you did not commit the theft or help the person who stole the property.

**You agree by signing this acknowledgment that you read, and understand this document and the Agreement.**

## Gaberik Holm

_____
Customer Name

08/31/2024

_____
Date

**You previously received, and agreed to in the Application, the Application Terms, Privacy Policy, Terms of Service, and ESIGN Agreement.**



THIS RENTAL-PURCHASE AGREEMENT CONTAINS AN ARBITRATION PROVISION (SEE ¶ 18 OF THE ADDITIONAL LEASE TERMS). UNLESS YOU PROMPTLY REJECT THE ARBITRATION PROVISION (SEE ¶ 18), THE ARBITRATION PROVISION WILL HAVE A SUBSTANTIAL EFFECT ON YOUR RIGHTS IN THE EVENT OF A DISPUTE, INCLUDING YOUR RIGHT TO BRING OR PARTICIPATE IN A CLASS PROCEEDING.

| LESSOR/OWNER | ACIMA DIGITAL, LLC, 5501 Headquarters Dr., Plano, TX 75024 |
|---|---|
| | Phone: (801) 297-1982 \| Online Portal: https://customer.acima.com/ |
| LESSEES/POTENTIAL PURCHASERS | Gaberik Holm, ■■■■■■■■■■■■■■ |

This Rental-Purchase Agreement ("Agreement") includes the "Disclosure Table," notice and Additional Lease Terms and Exhibit B below. In this Agreement, "you" and "your" mean the person(s) signing this Lease as Lessee/Potential Purchaser, and "we," "our," and "us" mean the Lessor/Owner identified above and its successors and assigns.

DISCLOSURE TABLE

| TOTAL OF PAYMENTS | COST OF RENTAL | ACIMA CASH PRICE | | |
|---|---|---|---|---|
| $2,306.12 | $1,281.18 | $1,024.94 | | |
| You must pay this amount to own the property if you make all the regular Renewal Payments (excludes tax). You can buy the property for less under the early purchase option. | Amount over Acima Cash Price you will pay if you make all regular Renewal Payments (excludes tax, and Other Charges). | Property available at this price for cash from the Lessor at the time of the Agreement. See about your early purchase option rights. | | |
| | AMOUNT OF EACH PAYMENT | NUMBER OF PAYMENTS | RENTAL PERIOD | |
| | $96.09/twice-monthly | 24 | 365 DAYS | |
| | Taxes will be added to all payments when required to do so by your state. | | This represents the duration of the Lease if all regularly scheduled payments are made. | |
| The rental property is NEW and is being acquired by the lessor on the lease date above. | | | | |

BY SIGNING THIS AGREEMENT: (1) YOU AGREE TO ALL ITS TERMS, INCLUDING THE ADDITIONAL LEASE TERMS BELOW (SEE, IN PARTICULAR THE EFT AUTHORIZATION (¶ 14) AND ARBITRATION PROVISION (¶ 18)) AND (2) YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT.

**Additional Lease Terms**

1.    **Definitions:** "Agreement" means this Rental-Purchase Agreement. "You" and "your" mean the person signing this Agreement as Lessee. "We," "our," and "us" mean Acima, Acima Leasing, and its subsidiaries, successors, and assigns, as Lessor/Owner of the Property. "Initial Rent Payment" means the rent payment required to consummate this Agreement. "Renewal Payment(s)" mean periodic or regular lease payments after the Initial Rent Payment for use of the leased Property. "Other Charges" mean any and all applicable charges, costs, and fees allowed for under this Agreement, which may accrue from time to time, after the commencement of the Agreement, and are not included in Renewal Payments. You should read the Agreement for an explanation of the Other Charges. Other Charges includes the Processing Fee, which is a fee required to consummate this Agreement in addition to the Initial Rent Payment. "Days" means calendar days unless otherwise specified. "Optional Services" mean additional services that may be offered to the Lessees/Potential Purchasers that are not mandatory and go beyond the required terms of the Agreement including, but not limited to, the Optional Liability Damage Waiver and Acima Benefits Plus. "Property" means the item(s) that are the subject matter of this Agreement; specifically, the **NEW TIRES ALIGNMENT AND LABOR FOR STARTER**.

2.    **Payments:** As set forth in the Disclosure Table, Renewal Payments of $96.09, plus tax of $7.45, totaling $103.54 are due twice-monthly thereafter while the Agreement remains in force, commencing on the day indicated in your lease application that you receive income or benefits, but no sooner than 7 days after the delivery date. Renewal Payments are made in advance. Acima charges and collects tax with each Renewal Payment when required to do so by your state. Your payment amount may change to the extent the tax rate changes after the date of this Agreement.

3.    **Cash Price:** The Acima Cash Price is $1,024.94 (which may include a delivery fee negotiated by you), and is the amount we would charge for a cash sale of the Property.

4.    **Acquisition of Property; Total of Payments; Early Purchase Option.** The total number and dollar amount of payments necessary to acquire ownership of the Property, disclosed in the Disclosure Table, do not include and is not reduced by Optional Services or Other Charges, such as, the Processing Fee, late payment fees or tax. You should read this Agreement for an explanation of any additional fees. The Agreement will terminate, and you will own the Property if you make the Initial Rent Payment and 24 Renewal Payments totaling $2,306.12 (the "Total of Payments") and a $1.00 Processing Fee. You can purchase the Property at any time during the first 3 months of the Agreement by paying us $1,024.94 plus tax and any Other Charges due, including the $1.00 Processing Fee minus any payments you have made. After this time, you can purchase the Property before the end of the Rental Period by making any payment then due or overdue plus Other Charges due and 45.0% of the remaining Renewal Payments. Applicable tax will be added to all payments. The Cost of Rental is $1,281.18. It is the difference between the Total of Payments and the Acima Cash Price, and does not include added Other Charges, including the Processing Fee. Payments to the Optional Services do not apply to the early purchase option amount. You are not automatically enrolled in early purchase options. To purchase early call (801) 297-1982 or go to https://customer.acima.com.

5.    **Other Charges:** Not included in Renewal Payments: i) $1.00 Processing Fee; ii) Costs of Lost/Destroyed/Damaged Property; iii) Repossession Costs; iv) Collection Costs; v) Re-delivery Costs; vi) $25.00 Returned Payment Fee (or the maximum amount permitted by law) for any payment that is returned to us unpaid; and vii) Late Payment Charges. If any payment due weekly is at least 3 days late or any payment due less often is at least 7 days late, we will charge you a late payment fee equal to the lesser of 5% of the Renewal Payment or $5, but not less than $2.

6.    **Ownership and Nature of Agreement:** WE OWN THE PROPERTY. This Agreement is a lease; a lease is a legal arrangement whereby the lessee/renter (you) agrees to pay the lessor/owner of the property (us) for use of the property for a specified period of time. You make Renewal Payments for the use of the Property for each renewal period only. You do not obtain ownership rights until you pay the Total of Payments plus all applicable taxes, or exercise an early purchase option. **You do not have the right to keep the Property if you do not make timely Renewal Payments**. If you do not want to lease the Property but would rather purchase the Property now, you should consider cash or credit terms that may be available to you.

7.    **Damage or Loss of Property:** You are responsible to pay us the lesser of the fair market value of the Property if, and as of the time, it is lost, stolen, damaged beyond normal wear and tear, or destroyed, or the amount required to exercise an early purchase option. We are not responsible for loss or damage caused by your intentional, willful, wanton, reckless, or negligent conduct. We do not carry insurance on this Property. You are responsible for its safety until it is returned to us. **Disclosure of Condition of Property:** You understand the Property may be new or used. You agree that we have not made any representations of the Property other than those contained in this Agreement. If you notice any damages to the Property, other than those disclosed by us, you agree to inform us of the damages before signing and we will amend this Agreement accordingly. **By signing**

LEASE NO: #21077924
LEASE DATE: 08/31/2024
4

this Agreement, you agree that you are satisfied with the condition of the Property and that no other damages exist other than those disclosed by us as follows: None.

8.    **Maintenance and Warranty:** We are responsible for maintaining the Property that is not operating properly during the Agreement term. We will repair the Property within 2 business days after you notify us of the problem. If we cannot repair the Property within this time, we will provide you with loaner Property. If we cannot repair the Property within 30 days after that, or longer time that you agree to, we will replace the Property with substitute Property that is satisfactory to you. We will not be responsible for the costs or the results of any repairs for damage caused by improper use. If any unexpired portion of all warranties provided by the manufacturer, distributor, seller of the Property, or third-party warranty, covers the Property at the time you acquire ownership, the warranties will be transferred to you, if allowed by the terms of the warranties. **To the extent permitted by law, we do not provide any Warranty of Merchantability or Fitness for a Particular Purpose, either Express or Implied, on the Property. You are renting the Property "as is" and "with all faults." You must keep the Property at the address listed above, unless we give you permission to move it.**

9.    **Minimum Rental Period:** The minimum rental period is the time between when you receive the Property and your first Renewal Payment. **You agree to make your first Renewal Payment outlined within this Agreement**. If you choose to return the Property thereafter, you must pay the unpaid Daily Lease Rate for the time you possess the Property, plus Other Charges due. The "**Daily Lease Rate**" is the Total of Payments divided by the number of days of the term of the Rental Period. **Your Rental Period is renewed with each Renewal Payment but will not exceed 365 days. Your Daily Lease Rate is $6.32.**

10.   **Termination:** We may terminate this Agreement and recover the Property if you breach this Agreement. You may terminate this Agreement at any time without penalty by returning the Property in accordance with o  irections, and by paying us any delinquent Renewal Payments, plus Other Charges due at the time of termination. You agree th  e is no refund  f any Renewal Payment for return or surrender of the Property before the end of the Rental Period. To begin the termin ion proce s call us at (801) 297-1986. **Collection Costs:** If you default on this Agreement, you may be responsible for all collection costs we  ur. We may, at our discretion, refer delinquent accounts to a third-party collection agency. **Right of Repossession:** If this Agreement terminates du o your breach of the Agreement, and you fail to return the Property, we have the right to repossess the Property. You agree to pay al  costs o  posse ion incurred, to the extent permitted by law. **Right of Cancellation:** You have the right to cancel the Agreement without pena y or obligation f you have not taken possession of the Property.

11.   **Reinstatement:** You will be in breach of this Agre ment if you f l to make a timely Renewal Payment within 7 days of the due date, if you pay weekly, or within 10 days, if you pay less equently than  kl  f you are in breach of this Agreement or you do not renew, we have the right to take possession of the Property so long s we don't breach the peace. However, unless you default on three consecutive payments, you may reinstate the Agreement without losing any rights previou y acquired by making all amounts you owe to us within 7 days if you pay weekly or within 10 days if you pay less frequently than weekly. If y u return the Property to us within that time, you will have 1 year from the date of the return to reinstate by making all payments due. If y nstate, we will furnish you with the same Property or substitute property of the same brand, if available, and of comparable quality, age, condition and warranty coverage.

12.   **Income Interruption Rights:** If your income is reduced by 25% or more after you have paid at least half of the Total of Payments, you may qualify for a reduction in the amount of your Renewal Payments. To qualify for a reduction, the reduction of your income must be due to job loss, involuntary reduced employment, illness, pregnancy, or disability, and you must provide evidence of the amount and cause of the reduction. Upon proof of the reduction, we will reduce the amount of each Renewal Payment by the same percentage amount that your income has been reduced, up to a maximum reduction of 50%. This reduction will continue during the period your income is reduced. Once your income is no longer reduced, your Renewal Payments will return to their normal amount, as disclosed in this Agreement. The Total of Payments will not change; however, the length of this Agreement and the total number of Renewal Payments that you will need to make if you wish to acquire ownership of the Property will increase.

13.   **Payment Method:** We will initiate electronic fund transfers from the bank account and/or credit card (or any substitute account you designate) provided by you in your application.

14.   **Payment Authorization:** You authorize us to initiate an electronic fund transfer ("EFT") over the ACH network (or another network of our choosing) from any bank account (or if no bank account is specified, then any account or card) listed on your application, or subsequently authorize us to debit or charge, for any renewal payment provided in this Agreement by its renewal date. If this EFT is returned unpaid, you authorize

us to charge any card or bank account provided to us for such payment. If your payment is returned unpaid, you authorize us to initiate a one-time EFT from your bank account or card to collect a fee of $25.00. You agree that we may resubmit any returned EFT or card charge as permitted by law and network rules. We are not responsible for any bank fees you incur resulting from returned payments. Instead of or in addition to any of the EFTs and card charges described in this section, you also authorize us to process any EFTs or card charges you subsequently confirm by phone, text message, or email. If we make an error in processing an EFT or card charge, you authorize us to initiate an EFT or card charge to correct the error. You may terminate this authorization to initiate EFTs and to charge the card. You may modify any bank account and card information, or change your scheduled payment dates, if the new payments coincide with the dates you receive income and do not materially increase the Agreement term. We will honor your termination or modification request if you contact us by phone at (801) 297-1920, or in writing at PO Box 1667, Draper, UT 84020, in time for us to receive your request at least 3 business days before the payment is scheduled to be made or far enough in advance for us to reasonably act on it. For purposes of this Agreement, our business days are Monday through Friday; holidays are not included. If any payment cannot be obtained by EFT or card charge, you remain responsible for such payment.

15.  **Reporting:** You authorize and instruct us to obtain a consumer report from a consumer reporting agency of our choosing, for purposes of verifying information on your application.

16.  **Returning a Computer or Other Electronic Device**: If you return or exchange a computer, tablet or other electronic device (collectively referred to as "Device"), it is your responsibility to remove all personal information or data containing personal information or other information that may be of a personal nature (such as emails, photos, or videos) and any software you have installed (collectively referred to as "Information") on the Device. Therefore, it is your responsibility to remove or make a back-up copy of any Information on the Device and restore the Device back to its original state, but this is not a guarantee that the Information will not be accessible by any subsequent user. We shall not be responsible for accessing, deleting, or destroying any Information left on the Device. You agree to hold us harmless in the event that any or all of your Information is accessed, altered, deleted, or destroyed as a result of returning the Device.

17.  **Servicing Devices**: (a) In the event that we service your Device, we or our service providers may have access to Information (such as emails, photos, videos, web searches, web queries, websites you visit, or technical information) loaded or stored on or recorded by your Device. While we will attempt to preserve as much of your Information as possible, in some circumstances Information may be permanently altered, deleted, or destroyed in the process of carrying out the servicing. Therefore, you should remove or make a back-up copy of any Information that you want to preserve or keep. You understand that by providing the Device for servicing, we may have access to any Information that has been loaded, stored on, or recorded by the Device. You consent to our viewing or accessing that Information as we deem necessary to carry out the requested service. You also agree to hold us harmless in the event that any or all of my Information is altered, deleted, or destroyed as a result of the service process or any type of access.

(b) WE EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRIGEMENT. WE MAKE NO WARRANTY THAT THE SERVICE WILL MEET YOUR REQUIREMENTS OR THAT THE SERVICE WILL BE TIMELY, SECURE, OR ERROR-FREE; NOR DO WE MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM THESE SERVICES.

(c) We shall not be liable for any direct, indirect, incidental, special, or consequential damages resulting from servicing your Device or any access to or alteration, deletion, or destruction of any Information on the Device, including but not limited to, damages for value, loss of profits, or other intangibles, even if we have been advised of the possibility of such damages. Some jurisdictions do not allow the limitation or exclusion of liability for incidental or consequential damages so some of the above limitation or exclusion of liability arising from or related to servicing your Device shall be limited to the sums you paid under the Agreement.

(d) We shall not be liable for any failure or delay in performance due to any cause beyond our control. We reserve the right to refrain from providing the requested services if we are unable to do so, including, but not limited to, instances where you did not authorize us to restore the Device.

18.  **JURY TRIAL WAIVER AND ARBITRATION CLAUSE**. By signing, you agree to this Jury Trial Waiver and Arbitration Clause ("Clause").

LEASE NO: #21077924
LEASE DATE: 08/31/2024

UPBOUND FKA RENT-A-CENTER/ ACIMA/ ACCEPTANCE NOW
CONSUMER ARBITRATION AGREEMENT
(CALIFORNIA)

Date: __08/31/2024_____

Rental-Purchase Agreement Number: _____#21077924_____

**PLEASE READ THIS ARBITRATION AGREEMENT. IT IS BINDING AND ENFORCEABLE UNLESS YOU SEND IN A REJECTION NOTICE, AS SET OUT IN PARAGRAPH (A) BELOW.**

This Arbitration Agreement ("Agreement") is between the Company and the Consumer. As used in this Agreement, the terms "Consumer" and "Consumers" mean the customers who sign this Agreement. The term "Consumer Contract" means the consumer lease, rental-purchase agreement, or retail installment sale contract between the Consumer(s) and the Company. The terms "you" and "your" mean the Consumer, customer, lessee, renter, user, buyer, and other third-party beneficiaries of the items or services the Company is providing, will provide, or has provided to you. And the term "the Company" means Acima Digital, LLC, d/b/a Acima Leasing, LLC and its past, present, and future parents, subsidiaries, affiliate entities (including, but not limited to Upbound Group, Inc. FKA Rent-A-Center, Inc. Acceptance Now, and Preferred Lease, and predecessors, or successors in interest. The Federal Arbitration Act (9 U.S.C. §§ 1-16) ("FAA") governs this Agreement, which evidences a transaction involving interstate commerce.

Except as otherwise provided in this Agreement, you and the Company agree to resolve by individual, final, and binding arbitration any and all claims or controversies, past, present, or future, that the Company may have against you or that you may have against the Company and/or (i) its directors, officers, members, managers, employees, or agents in their capacity as such or otherwise; (ii) its successors or assigns; and (iii) its clients and host stores, in accordance with the terms and procedures set forth in this Agreement. Each of the entities and/or individuals listed in this paragraph can enforce this Agreement.

**(A) Your Right to Reject:** If you want to reject this Agreement, you must send a written Rejection ... y certified mail, return receipt requested, to: Upbound Legal Department, 5501 Headquarters Drive, Plano, TX 75024-5837. The Rejection Notice must (i) state that you're rejecting this Agreement; (ii) provide your name, address, and phone number; and (iii) provide the agreement number from the Consumer Contract you entered into with ... Company, which is incorporated into this Agreement as though fully set forth. A Rejection Notice is effective only if it is signed by all Consumers who signed the Consumer Contract with the Company and postmarked within fifteen (15) days after the date of those signatures. The Company will acknowledge ... ur rejec ... n in writing. You should retain the acknowledgement to establish rejection of this Agreement. If you do not receive the acknowledgement from the Company with ... if ... en (15) days from the date you sent the Rejection Notice to the Company, then you should contact the Upbound Legal Department by mail or by email ... arb ... ion.rej ... @rentacenter.com. A Rejection Notice applies only to this Agreement and does not affect the validity or enforceability of any past or future Arbitrat ... n Agreements ... tween y ... u and the Company.

**(B) What Claims Are Covered:** You and the Company agree that, in ... e event of any cov ... ed dispute or claim between us, you and the Company agree to have that dispute or claim resolved by final and binding arbitration. This agreement to arb ... ate is intended ... be interpreted as broadly as the FAA allows. Claims and disputes subject to arbitration include but are not limited to:

- claims arising under, arising out of, or relat ... g in any way to any Consumer Contract entered into between you and the Company at any time and/or any services rendered under or that relate to any such Co ... sumer Contract;

- claims arising out of or relating in any way to yo ... r interactions ... th or any actions taken by the Company or any of its employees or agents, including but not limited to allegations that those employees or agents acted imp ... per ... in terminating your Consumer Contract, repossessing goods, or making complaints or reports about you to law enforcement, credit reporting bureaus, or any other third party;

- claims relating to the retention, protection, use, or transfer of information about you or any of your accounts;

- claims relating to communications with you, regardless of sender, concerning any of our or our marketing partners' products or services, including emails and automatically dialed calls and text messages;

- claims that arose before the execution of this Agreement or any current or prior Consumer Contract between you and the Company, such as claims related to advertising or disclosures;

- claims that arise after the termination of any Consumer Contract between you and the Company;

- claims that are based on any legal theory whatsoever, including negligence, breach of contract, tort, fraud, misrepresentation, trespass, the common law, or any statute, regulation, or ordinance; and

- except as specified in the Class Action Waiver below, any and all disputes relating to the interpretation, applicability, enforceability, scope, waiver, or formation of this Agreement, including but not limited to any contention that all or any part of this Agreement is void or voidable.

**(C) What Claims Are Not Covered:** This Agreement does not cover:

- criminal proceedings and/or making a report or filing a claim with any law enforcement agency, initiated by you or the Company; initiating or participating in criminal proceedings and/or making a report of filing a claim with any law enforcement agency shall not be a waiver of any right to arbitrate under this Agreement, but any action by either party for abuse of process, improper criminal proceedings, or similar action arising out of any law enforcement/criminal proceedings/claim with any law enforcement agency is covered by this Agreement and must be arbitrated;

- claims under California law for an injunction on behalf of the general public, which may only be maintained in a court of competent jurisdiction; however, that court proceeding shall be stayed until the completion of arbitration in accordance with this Agreement of all other remedies sought under California law (such as damages and private injunctive relief); and

• disputes that applicable federal statutes exempt from arbitration, overriding the FAA.

**(D) Small Claims Court Option:** Notwithstanding the foregoing, you and the Company each have the right to file an individual action in small claims court if it is within the jurisdiction of the small claims court and remains in that court. The defendant or counterclaim defendant in such a small claims court action may not elect to leave the claim resolved by binding arbitration. If your jurisdiction permits small claims court judgments to be appealed to a court of general jurisdiction for a trial de novo, we agree that any such appeal shall be resolved in arbitration in accordance with this Agreement instead of in that court of general jurisdiction.

**(E) Class Action Waiver:** You and the Company agree that arbitration shall be conducted on an individual basis only. There will be no right or authority for any dispute to be brought, heard, or arbitrated as a class, mass, or representative action or for the Arbitrator to award declaratory or injunctive relief on behalf of others ("Class Action Waiver"). Nor shall the Arbitrator have any authority to hear or preside over any such dispute. In the event a final judicial determination is made that the Class Action Waiver is unenforceable and that a class, mass, or representative action or request for public injunctive relief may proceed notwithstanding the existence of this Agreement, the Arbitrator is nevertheless without authority to preside over a class, mass, or representative action or one seeking public injunctive relief. Instead, the claims or requests for particular remedies (such as a request for a public injunction) as to which the Class Action Waiver is unenforceable shall be severed and decided by a court of competent jurisdiction after all other claims (and requests for other remedies) are arbitrated in accordance with this Agreement.

Regardless of anything else in your Consumer Contract, this Agreement, or the arbitration provider's rules or procedures, any disputes relating to the interpretation, applicability, scope, waiver, and enforceability of this Class Action Waiver, including but not limited to any claim that all or part of this Class Action Waiver is void or voidable, may be determined only by a court—not by the Arbitrator.

**(F) Pre-Arbitration Notice of Dispute:** A party who intends to seek arbitration must first send to the other, by certified mail, return receipt requested, a written Notice of Dispute. A Notice of Dispute to the Company should be addressed to: Upbound Legal Department, 5501 Headquarters Drive, Plano, TX 75024-5837. Notices of Dispute to you will be sent to you at the last known address you provided to the Company. A Notice of Dispute must (i) provide your name, address, phone number, and Consumer Contract number; (ii) describe the nature and basis of the claim or dispute; (iii) set forth the specific relief sought; and (iv) be signed by the party seeking arbitration (*i.e.*, either you personally or a Company representative). If you are the party seeking arbitration and you have retained an attorney, your Notice of Dispute must also include your signed statement authorizing the Company to disclose your confidential account records to your attorney if necessary in resolving your claim.

**(G) Informal Settlement Conference:** After the Notice of Dispute containing all of the information required by paragraph (F) is received, within 60 days, either party may request a conference to discuss in good faith a potential informal resolution of the dispute, without the need to go forward in an arbitration ("Informal Settlement Conference"). If timely requested, the Informal Settlement Conference will take place at a mutually agreeable time by telephone or videoconference. You and a Company representative must both personally participate; any counsel representing you or the Company also may participate. The requirement of personal participation in an Informal Settlement Conference may be waived only if both you and the Company agree in writing. All statutes of limitations applicable to the claims described in a Notice of Dispute shall be deemed to be tolled during the period between the date that a fully complete Notice of Dispute is received and the later of (1) 60 days after receipt of the Notice of Dispute; or (2) if an Informal Settlement Conference is timely requested, 30 days after completion of the Informal Settlement Conference (the "Informal Resolution Period").

**(H) Commencing Arbitration:** An arbitration proceeding may not be commenced until the claimant has complied with the Notice of Dispute and Informal Settlement Conference requirements of paragraphs (F) and (G). Therefore, no party shall commence an arbitration proceeding until after the latter of (i) 60 days after the Notice of Dispute has been received or (ii) if an Informal Settlement is timely requested, 30 days after the completion of the Informal Settlement Conference. A court will have authority to enforce this paragraph (H), including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice of Dispute and participating in a timely requested Informal Settlement Conference. Unless prohibited by applicable law, the arbitration administrator is without authority to accept or administer any arbitration proceeding unless the claimant has complied with the Notice of Dispute and Informal Settlement Conference requirements of paragraphs (F) and (G).

To commence arbitration, the claimant shall file a request for Arbitration with the American Arbitration Association ("AAA") and must send a copy of the Request for Arbitration to the other party by certified mail, return receipt requested. Requests for arbitration by you should be sent to: Upbound Legal Department, 5501 Headquarters Drive, Plano, TX 75024-5837. Requests for arbitration by the Company will be sent to you at the last known address you provided to the Company. The AAA's address is as follows: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. The AAA's current address and/or email address also may be found on its web site at www.adr.org. Requests for arbitration must be clearly marked "Request for Arbitration," include your name, address, phone number, Consumer Contract number, and signature, as well as provide a short statement of the claim and the specific relief that is being sought.

**(I) The Arbitration Process:** Arbitration is more informal than a lawsuit in court. **In arbitration you and the Company each give up the right to a trial by judge or jury.** The arbitration will be administered by the AAA and, except as provided in this Agreement, shall proceed in accordance with the AAA's Consumer Arbitration Rules ("AAA Rules") in effect at the time the arbitration commences; however, if there is a conflict between the AAA Rules and this Agreement, this Agreement shall govern. The AAA Rules are available at **www.adr.org, by calling the AAA at 1-800-778-7879 or its then current telephone number** as provided on its web site, or by sending a written request to: **American Arbitration Association, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.** If the AAA is unavailable or unwilling to administer the matter consistent with this Agreement, the parties may agree to or a court of competent jurisdiction shall select an arbitrator to administer the arbitration or otherwise fulfill the duties of the AAA under this Agreement. Any such substitute arbitrator shall apply the terms of this Agreement and AAA Rules, as modified by this Agreement. Unless the parties agree otherwise, the Arbitrator shall be either an attorney who is experienced in commercial law and licensed to practice law in at least one state or a retired judge from any jurisdiction (the "Arbitrator"). Unless the parties agree otherwise, the arbitration shall take place in the U.S. city or county in which you reside at the time arbitration is commenced.

For claims seeking relief valued at $75,000.00 or less (to both you and the Company), excluding attorney's fees and costs, the AAA shall appoint the Arbitrator in accordance with its rules and procedures. For all claims seeking relief above $75,000.00 in value (to either you or the Company), excluding attorney's fees and costs, unless prohibited by the AAA (in which case the AAA's rules and procedures for arbitrator selection shall apply), the Arbitrator shall be selected as follows: The AAA shall give each party a list of five (5) arbitrators drawn from its roster of arbitrators. Each party shall have ten (10) calendar days from the receipt of the list to strike all names on the list it deems unacceptable. If only one (1) common name remains on the lists of all parties, that individual shall be designated as the Arbitrator. If more than one (1) common name remains on the lists of both parties, the parties shall strike names alternately from the list of common names until only one (1) remains. The party who did not initiate arbitration shall strike first. If no common name remains on the lists of all parties, the AAA shall furnish an additional list of five (5) arbitrators from which the parties shall strike alternately,

7-3

with the party who initiated arbitration striking first, until only one (1) name remains. That person shall be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of five (5) arbitrators and repeat the alternate striking selection process.

Subject to the Class Action Waiver, the Arbitrator may award any party any remedy to which that party is entitled under applicable law (including without limitation legal, equitable, and injunctive relief), but such remedies shall be limited to those that would be available to a party in his/her/its individual capacity in a court of law for the claims presented to and decided by the Arbitrator. Except to the extent preempted by the FAA, the Arbitrator shall apply the substantive law, including but not limited to the applicable statutes of limitations (and the law of remedies, if applicable) of the state of the Consumer's mailing address with the Company at the time arbitration commences, or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. In addition, the Arbitrator may consider rulings in other arbitrations involving different consumers, but unless prohibited by applicable law, an arbitrator's ruling will not be binding or have preclusive effect in proceedings involving different consumers.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone, videoconference, or in person, as the Arbitrator deems necessary. Either party may file a motion to dismiss and/or a motion for summary judgment.

Any party may arrange for a court reporter to provide a stenographic record of the proceedings in accordance with the AAA Rules. Should any party refuse or neglect to appear for, or participate in, the arbitration hearing, the Arbitrator shall have the authority to decide the dispute based upon the evidence that is presented. Upon request at the close of the hearing, either party shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The Arbitrator shall render an award no later than thirty (30) days from the date the arbitration hearing concludes or the post-hearing briefs (if requested) are received, whichever is later, unless the parties agree otherwise. The award shall be in writing and include the factual and legal basis for the award. Before the Arbitrator issues this award, neither the Company nor you should disclose the substance of any settlement offers to the Arbitrator.

Each party shall have the right to take the deposition of one (1) individual fact witness and any expert witnesses designated by the other party. Each party shall have the right to send requests for production of documents to any party, consistent with applicable legal privileges, the informal and expedited nature of arbitration, and each party's right to a fundamentally fair hearing. At either party's request, the Arbitrator may allow additional discovery. Additional discovery is also permitted by the parties' mutual agreement in writing.

(J) **Arbitration of Claims of $10,000.00 or Less:** If you fully complied with the requirements in Paragraphs (F) and (G) above and you initiate arbitration of claims seeking relief valued at $10,000.00 or less (to both you and the Company), excluding attorney's fees and costs, and the Arbitrator issues you an award that is greater than the value of the Company's last written settlement offer made before the Arbitrator was selected, then the Company will (i) pay you $10,000.00 ("the alternative payment"). If your claim seeks relief valued at $10,000.00 or less (to both you and the Company), excluding attorney's fees and costs, and the Company did not make a written offer to settle the dispute before the Arbitrator was selected, you will be entitled to receive the alternative payment if the Arbitrator awards you any relief on the merits. The Arbitrator shall make any rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment, upon request from either party made within fourteen (14) days of the Arbitrator's ruling on the merits. The alternative payment is available only for arbitrations in which (i) you seek relief valued at $10,000.00 or less (to both you and the Company); (ii) you have fully complied with the requirements of Paragraphs (F) and (G); and (iii) you have not disclosed the substance of any settlement offer by the Company to the Arbitrator before an award on the merits is issued. In assessing whether an award that includes attorney's fees or expenses is greater than the value of the Company's last written settlement offer, the Arbitrator shall not consider amounts offered for or awarded in attorney's fees or costs. If you are entitled to statutory attorney's fees, then the Arbitrator shall decide any award of attorney's fees. If, after commencing arbitration, you amend your claim to include new or different claims or to request different or greater relief than you initially requested, the AAA or the Arbitrator shall stay further arbitration proceedings for thirty (30) days. During that time, the Company may make a written settlement offer. If not accepted following the issuance of the award, that offer will be used by the Arbitrator to determine whether you are entitled to the alternative payment. If the AAA appointed an emergency arbitrator to decide a request for emergency relief before the regular Arbitrator who decided the merits of the claims was selected, the Company's last written settlement offer made before the appointment of the later-selected regular Arbitrator shall be the offer used to determine eligibility for the alternative payment.

(K) **Judicial Review:** Judicial review shall be governed by the Federal Arbitration Act. 9 U.S.C. §§ 9-11. The decision of the Arbitrator may be entered and enforced as a final judgment in any court of competent jurisdiction.

(L) **Arbitration Fees and Costs:** You and the Company shall follow applicable law and the AAA Rules applicable to initial filing fees. To the extent that the Company initiates arbitration, the Company will be responsible for the filing and initial appearance fees. To the extent that you initiate arbitration, you will be responsible for the lesser of the applicable AAA filing fee or the filing or initial appearance fee applicable to court actions in the jurisdiction where the arbitration will be conducted. The Company will pay any remaining portion of the initial fee and also will pay all costs and expenses unique to arbitration, including without limitation the Arbitrator's fees. The Arbitrator shall determine all factual and legal issues regarding the payment and/or apportionment of said fees and costs. Each party shall pay for its own costs and attorney's fees, if any. However, if applicable law would entitle a party to an award of reasonable attorney's fees, or if there is a written agreement providing for attorney's fees, the Arbitrator may award such fees as provided by law. In the event applicable law requires a different allocation of arbitral fees and costs in order for this Agreement to be enforceable, then such law shall be followed.

(M) **Interstate Commerce:** You understand and agree that the Company is engaged in transactions involving interstate commerce and that the Federal Arbitration Act therefore governs this Agreement.

(N) **Sanctions:** To the extent allowed by applicable law and if the claim(s) or counterclaim(s) brought by either party in arbitration allow for imposition of sanctions, the Arbitrator may award either party its reasonable attorneys' fees and costs, including reasonable expenses associated with production of witnesses or proof, upon a finding that the claim or counterclaim was frivolous or brought solely to harass you or the Company.

(O) **Sole and Entire Agreement:** This is the complete Agreement of the parties on the subject of arbitration of claims or disputes covered by this Agreement. This Agreement to arbitrate shall survive the termination of any Consumer Contract you entered into with the Company. Unless this Agreement is rejected in accordance with Paragraph A above or unless this Agreement in its entirety is deemed void, unenforceable, or invalid by a court of competent jurisdiction or arbitrator as applicable, this Agreement

7-3

supersedes any prior or contemporaneous oral or written understandings on the subject. No party is relying on any representations, oral or written, on the subject of the effect, enforceability, or meaning of this Agreement, except as specifically set forth in this Agreement.

**(P) Construction:** Subject to the Class Action Waiver above, if any provision of this Agreement is adjudged to be void or voidable or otherwise unenforceable, in whole or in part, such provision shall be severed from this Agreement, and the adjudication shall not affect the validity of the remainder of the Agreement. All remaining provisions shall remain in full force and effect. A waiver of one or more provisions of this Agreement by any party shall not be a waiver of the entire Agreement. For convenience, this Agreement has page numbers starting at page 1; however, nothing about the pagination or headings in this Agreement is intended to change the intent and legal effect that this Agreement is incorporated into the Consumer Contract and is part of the same set of documents comprising the Consumer Contract. You and the Company agree that an electronic copy or photocopy of this Agreement shall have the same force and effect as the original.

**(Q) Consideration:** The mutual obligations by you and the Company to arbitrate differences provide consideration for each other.

## ACKNOWLEDGEMENT

BY SIGNING BELOW, YOU ACKNOWLEDGE THAT: (1) YOU HAVE READ THIS ENTIRE ARBITRATION AGREEMENT CAREFULLY; (2) YOU ARE ENTERING INTO THIS ARBITRATION AGREEMENT VOLUNTARILY; (3) YOU HAVE THE RIGHT TO REJECT THIS ARBITRATION AGREEMENT IN ACCORDANCE WITH PARAGRAPH (A) ABOVE; (4) YOU AUTHORIZE THE USE OF AN ELECTRONIC SIGNATURE (SUCH AS DOCUSIGN) TO SHOW YOUR ACCEPTANCE TO THIS ARBITRATION AGREEMENT AND ACKNOWLEDGE THAT YOUR ELECTRONIC SIGNATURE IS INTENDED TO SHOW YOUR ACCEPTANCE AND IS AS VALID AND HAS THE SAME LEGAL EFFECT AS AN INK SIGNATURE; AND (5) YOU HAVE BEEN PROVIDED WITH A DUPLICATE SIGNED COPY OF THIS ARBITRATION AGREEMENT.

### END OF ARBITRATION AGREEMENT

AGREED TO: (Only Signatures Follow)

### SIGNATURES

Date: 08/31/2024                                Gaberik Holm
_____          _____
                                 Signature - Consumer

                                 Gaberik Holm
                                 _____
                                 Printed Name


Date: 08/31/2024                                Gaberik Holm
_____          _____
                                 Signature - Consumer

                                 Gaberik Holm
                                 _____
                                 Printed Name


                                 *Donna Crump*
                                 _____
                                 Signature - Company Representative

                                 Donna Crump
                                 _____
                                 Printed Name

LEASE NO: #21077924
LEASE DATE: 08/31/2024
10

Print and retain a hard copy or electronic copy.

19.    **MISCELLANEOUS: Restrictive Endorsement:** We have the right to accept any check marked "payment in full" or any other restrictive endorsement without losing any of our rights to collect on the entire amount you owe us. **Governing Law, Venue:** This Agreement is governed by the laws of the state where you live. Venue for any dispute arising out of this Agreement will be the county where you live. **Severability:** If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement will remain in full force and effect. You understand that time is of the essence in this Agreement. **Entire Agreement:** This Agreement represents the entire agreement between you and us concerning the Property.

20.    **COMMUNICATION & MARKETING:** You understand and agree that we may monitor and/or record any of your phone conversations with any of our representatives. We may use automated telephone dialing, text messaging systems, and electronic mail to provide messages to you about your Agreement. You understand that when you receive such texts, calls, or e-mails, you may incur a charge from your communications provider. You consent to (i) contact at any address (including e-mail) or telephone number (including wireless cellular or residential landline) that you provide; (ii) any means of communication to reach you; (iii) the use of automated dialing systems and/or prerecorded messages; and (iv) text messages sent to your phone. No such contact will be deemed unsolicited or unauthorized. **You understand that receipt of goods and/or services is not conditioned upon your consent provided herein.** You consent to be contacted, from time to time, by Acima its affiliates, vendors, agents, successors and assigns, regarding your account, for collection purposes, and for telemarketing, mail, and email marketing purposes such as promoting goods and/or services at the telephone numbers and addresses provided to us.

*Right to Opt-out:* You understand you may opt-out of promotional communications at any time by writing to PO Box 1667, Draper, UT 84020 or by email at privacy@acima.com.

**NOTICE TO LESSEE**

**You are renting this property. You will not own it until you make all of the regularly scheduled payments or you use an early purchase option. You do not have the right to keep the property if you do not make required payments or do not use an early purchase option. If you miss a payment, we can repossess the property, but, you may have the right to the return of the same or similar property. See the contract for an explanation of your rights.**

Notice to the Lessee(s):

(a)    Do not sign this Rental-Purchase Agreement before you read it or if it contains any blank spaces.

(b)    You are entitled to an exact copy of the Rental-Purchase Agreement you sign. Keep it to protect your legal rights.

**BY SIGNING THIS AGREEMENT: (1) YOU ACKNOWLEDGE RECEIPT OF AN EXACT COPY OF THIS AGREEMENT, INCLUDING A COPY OF THE ABOVE TABLE; AND (2) YOU AGREE TO ALL TERMS OF THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION (¶18), AND THE EFT AUTHORIZATION (¶14).**

When you sign the Agreement, Acima or one of its subsidiaries will purchase the Property you have selected at a retailer's store and enter a rental-purchase contract with you for the Property. The following table shows certain financial details of the lease:

| TOTAL OF PAYMENTS | COST OF RENTAL | ACIMA CASH PRICE | | |
|---|---|---|---|---|
| $2,306.12 | $1,281.18 | $1,024.94 | | |
| You must pay this amount to own the property if you make all the regular Renewal Payments (excludes tax). You can buy the property for less under the early purchase option. | Amount over Acima Cash Price you will pay if you make all regular Renewal Payments (excludes tax, and Other Charges). | Property available at this price for cash from the Lessor at the time of the Agreement. See about your early purchase option rights. | | |
| | AMOUNT OF EACH PAYMENT | NUMBER OF PAYMENTS | RENTAL PERIOD | |
| | $96.09/twice-monthly | 24 | 365 DAYS | |
| | Taxes will be added to all payments when required to do so by your state. | | This represents the duration of the Lease if all regularly scheduled payments are made. | |

7-3

The rental property is NEW and is being acquired by the lessor on the lease date above.

Gaberik Holm

X_____

LESSEE



X_____

Donna Crump, Authorized Representative, Acima Digital, LLC

This writing and the obligations evidenced hereby are subject to the security interest of JPMorgan Chase Bank, N.A., as Administrative Agent.

# Exhibit B

You can purchase the Property at any time during the first 90 Days (three months if in California) of the Agreement by paying us the Acima Cash Price plus tax and any Other Charges due, minus any payments you have made. You have the right to acquire ownership of the Property at any time after the first 90 Days (three months if in California) by tendering to us an amount equal to all past due payments and fees, plus an amount equal to 45.0% of all Renewal Payments remaining under the Agreement. You must affirmatively elect to exercise the Early Purchase Option. In no event shall the Early Purchase Option Amount be less than the amount of one Renewal Payment.

The table below shows the amount required to exercise the Early Purchase Option after each rent payment, assuming each rent payment is paid on time.

| Rent Payment # | Rent Payment Amount | Remaining Total of Rent Payments | Early Purchase Option Amount |
|---|---|---|---|
| 1 | $0.00 | $2,306.12 | $1,024.94 |
| 2 | $96.09 | $2,210.03 | $928.85 |
| 3 | $96.09 | $2,113.94 | $832.76 |
| 4 | $96.09 | $2,017.8 | $736.67 |
| 5 | $96.09 | $1,92 .76 | $640.58 |
| 6 | $96.09 | $1,82 .67 | $821.55 |
| 7 | $96.09 | $ ,729.58 | $778.31 |
| 8 | $96.09 | $1,633.49 | $735.07 |
| 9 | $96.09 | $1,537.40 | $691.83 |
| 10 | $96.09 | $1,441.31 | $648.59 |
| 11 | $96.09 | $1,345.22 | $605.35 |
| 12 | $96.09 | $1,249.13 | $562.11 |
| 13 | $96.09 | $1,153.04 | $518.87 |
| 14 | $96.09 | $1,056.95 | $475.63 |
| 15 | $96.09 | $960.86 | $432.39 |
| 16 | $96.09 | $864.77 | $389.15 |
| 17 | $96.09 | $768.68 | $345.91 |
| 18 | $96.09 | $672.59 | $302.67 |
| 19 | $96.09 | $576.50 | $259.42 |

COPY

LEASE NO: #21077924
LEASE DATE: 08/31/2024

| 20 | $96.09 | $480.41 | $216.18 |
| 21 | $96.09 | $384.32 | $172.94 |
| 22 | $96.09 | $288.23 | $129.70 |
| 23 | $96.09 | $192.14 | $86.46 |
| 24 | $96.09 | $96.05 | $43.22 |
| 25 | $96.05 | $0.00 | $0.00 |

The amounts and payments reflected in this table do not include applicable sales tax amounts and may change based on events that occur after this document was created.  Please visit www.acima.com for the most accurate Early Purchase Option Amount.



# EXHIBIT 2



FIND STORE HOURS
AND LOCATIONS ONLINE
AMERICANTIREDEPOT.COM

Started Time: 8/30/2024 5:16:39 PM
Invoiced Time: 8/31/2024 4:52:33 PM

Invoice#: 1153-5267109

| CUSTOMER INFORMATION | VEHICLE INFORMATION | STORE LOCATION |
|---|---|---|
| **HOLM, JABERIK**  Cust #: ED-8474395 | 2016 Honda Civic LX  Engine: 2.0L I4 F DOHC 16V | OCEANSIDE #1153                    BAR#:ard301159  515 N COAST HWY                   EPA#:CAL000470350  OCEANSIDE, CA 92054  Phone: (760) 722-1251  Started By: OL955  Invoiced By: MATTHEW ISPECKY (MI369) |

| BRAND | PART | DESCRIPTION | TECH | SALESPERS | PRICE | QTY | TOTAL |
|---|---|---|---|---|---|---|---|
| LBR | UCI | REASON FOR VISIT; GUEST REQUESTED NO START INSPECTION | RH677 | OL955 | $0.00 | 1.0000 | $0.00 |
| LBR | CVI | COMPREHENSIVE VEHICLE INSPECTION | RH677 | OL955 | $49.99 | 1.0000 | $49.99 |
| ACC | 1200023`43 | @215/50ZR17XL PHI HWY 95W BL ACC -  **Tire Serial #**   V8B8N856N45 2323    V8B8N856N45 2323  V8B8N856N45 2323    V838N856N45 2323  *Minimum Mileage Warranty: 50000*  *\*\*\*\*\*\*\*\*\* CONSUMER ADVISORY \*\*\*\*\*\*\*\*\* THIS IS A "W" RATED TIRE. IT HAS A MAXIMUM SPEED OF 168 MPH. IT HAS "W" HANDLING*  *CHARACTERISTICS. CONSULT YOUR OWNERS MANUAL FOR THE PROPER SPEED RATING RECOMMENDED FOR YOUR VEHICLE. CUSTOMERS*  *INITIALS _____* | RH677 | MI369 | $99.99 | 4.0000 | $399.96 |
| CDF | CDF | TIRE RECYCLING | RH677 | MI369 | $5.00 | 4.0000 | $20.00 |
| LBR | WBHS | HIGH SPEED WHEEL BALANCE | RH677 | MI369 | $21.00 | 4.0000 | $84.00 |
| SHP | WW | PREMIUM WHEEL WEIGHTS | RH677 | MI369 | $4.50 | 4.0000 | $18.00 |
| EW | EW | TIRE MAINTENANCE CERTIFICATE -- EXTENDED WARRANTY  *LIFETIME REPLACEMENT/REPAIR/REFUND CERTIFICATE \*\*\*\* SEE WEBSITE FOR DETAILS* | RH677 | MI369 | $15.00 | 4.0000 | $60.00 |
| STF | STF | CALIF. STATE TIRE FEE  *I have been informed of the benefits of BBT's Tire Maintenance Certificate program. ALL-WHEEL DRIVE VEHICLE NOTICE - Most manufacturers recommend*  *the rolling radius of all 4 tires must be the same. Tires should be replaced in sets of 4 to match brand, size, design and tread depth. Please consult your*  *owners manual for the Original Equipment Vehicle Manufacturers recommendations. TWO TIRE PURCHASE ONLY - SAFETY ADVISORY - The Tire*  *Association Council states that if only two new tires are installed on the front of a vehicle, the rear worn tires could loose their grip under load or slippery*  *conditions causing loss of control.* | RH677 | MI369 | $1.75 | 4.0000 | $7.00 |
| LBR | LABAS | VEHICLE ALIGNMENT - STANDARD (2 OR 4 WHEEL)  *LABOR INCLUDED: CHECK CAMBER CASTER AND TOE SETTINGS. MAKE ALL NECESSARY ADJUSTMENTS TO CONFORM TO VEHICLE*  *MANUFACTURER'S SPECIFICATIONS FOR FRONT WHEELS AND REAR IF APPLICABLE. RE-CALIBRATE STEERING ANGLE SENSOR (SAS) WHERE*  *APPLICABLE* | RH677 | MI369 | $129.99 | 1.0000 | $129.99 |
| LBR | LABM | MITCHELL LABOR TIME: 2.0, OPERATION: REMOVE AND REPLACE STARTER ASSEMBLY, NOTES: ALL APPLICABLE MODEL | RH677 | MI369 | $178.00 | 2.0000 | $356.00 |
| CPN | MPD | ZZ MILITARY DISCOUNT 5% | RH677 | MI369 | $100.00 | -1.0000 | $-100.00 |
| LBR | UCI | TECH INSPECTION DETERMINED STARTER HAS NO SIGNAL-CABIN/AIR FILTER DIRTY-3 TIRE ARE LOW RR HAS NAIL -BRAKE FLUID FAILED TEST STRIP-COOLANT FAILED TEST STRIP-OIL DARK/DIRTY | RH677 | MI369 | $0.00 | 1.0000 | $0.00 |
| LBR | UCI | GUEST WAS ADVISED WHEEL LOCK LUGS ARE WRONG SIZE AND DONT TORQUE FULLY- ALSO ONE LUG WAS WRONG SIZE AND DIDNT INSTALL TO SAVE FROM RIM DAMAGE- 1 WHEEL HAS NO LUG NUT KEY | RH677 | MI369 | $0.00 | 1.0000 | $0.00 |

Vehicle Tire Pressure - F:32 R: 32





FIND STORE HOURS
AND LOCATIONS ONLINE
AMERICANTIREDEPOT.COM

**Started Time:** 8/30/2024 5:16:39 PM
**Invoiced Time:** 8/31/2024 4:52:33 PM

Invoice#: 1153-5267109

| CUSTOMER INFORMATION | VEHICLE INFORMATION | STORE LOCATION |
|---|---|---|
| **HOLM, JABERIK**    Cust #: ED-8474395 | 2016 Honda Civic LX<br>Engine: 2.0L I4 F DOHC 16V | OCEANSIDE #1153    BAR#:ard301159<br>515 N COAST HWY    EPA#:CAL000470350<br>OCEANSIDE, CA 92054<br>Phone: (760) 722-1251<br>Started By: OL955<br>Invoiced By: MATTHEW ISPECKY (MI369) |

## Invoiced Summary

### Revisions

| Date | Emp. | Prev. | Revised | Type | Auth | Email/ Phone |
|---|---|---|---|---|---|---|
| 08/31/2024 11:43 AM | MI369 | 49.99 | 1061.08 | Phone Call | HOLM | 6516759963 |

*Reason for price increase: Tire(s)*

*Description of all additional parts and labor: 4 TIRES ALIGNMENT STARTER INSTALL*

### Payment

| Type | Amount |
|---|---|
| ACIMA | 1024.94 |

### Invoice Totals

| | |
|---|---|
| **Parts:** | $437.96 |
| **FET:** | $0.00 |
| **Shop Fees:** | $0.00 |
| **NonTax:** | $586.98 |
| **Tax:** | $0.00 |

| | |
|---|---|
| **Total:** | $1024.94 |

I acknowledge below and receipt of this invoice

_____

This estimate is based on our inspection at this time and does not cover additional parts and labor which may be required after the work has been started. After the work has started, worn or damaged parts which are not evident on first inspection may be discovered. This estimate cannot cover such contingencies. In cases where additional work is deemed necessary, customer authorization will be secured prior to commencement of that additional work. This estimate expires 15 days from date. I hereby authorize the repair work to be done along with the necessary material and hereby grant you and or your employees permission to operate the vehicle herein described on the streets, highways or elsewhere for the purpose of testing and/or inspection. An express mechanic's lien is hereby acknowledged on above vehicle to secure the amount of repairs thereto. Dealer not responsible for unavailability of parts or delays in parts shipments beyond dealers control not for loss or damage to vehicle or articles left in vehicle in case of fire, theft or any other cause beyond our control. 12 months/12,000 miles for parts and labor. 3 months/3,000 miles for alignment warranties. See website for additional warranty details. All parts are new unless otherwise specified.

Customer Signature or Initials: _____

I acknowledge notice and oral approval of an increase in the original estimated price.