1  MATTHEW PREVIN
matthewprevin@paulhastings.com
2  BRADLEY J. BONDI
bradbondi@paulhastings.com
3  MICHAEL MORRILL
michaelmorrill@paulhastings.com
4  PAUL HASTINGS LLP
200 Park Avenue
5  New York, New York 10166
Telephone:  (212) 318-6000
6  Facsimile:  (212) 319-4090

7  CHRISTOPHER H. MCGRATH (SB# 149129)
chrismcgrath@paulhastings.com
8  PAUL HASTINGS LLP
4655 Executive Drive, Suite 350
9  San Diego, CA 92121
Telephone:  (858) 458-3000
10  Facsimile:  (858) 458-3005

11  *Attorneys for Defendant*
*Acima Digital, LLC*
12

13  UNITED STATES DISTRICT COURT

14  SOUTHERN DISTRICT OF CALIFORNIA

15

16  GABERIK HOLM, individually, and on
behalf of all others similarly situated,

17            Plaintiff,

18      vs.

19  ACIMA CREDIT DIGITAL, LLC (f/k/a
ACIMA CREDIT, LLC d/b/a ACIMA
20  CREDIT LEASING),

21            Defendant.

22

23

24

25

26

27

28

CASE NO. 3:24-cv-02345-GPC-AHG

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS CLASS CLAIMS AND STAY INDIVIDUAL CLAIMS IN FAVOR OF ARBITRATION**

**Hon. Gonzalo P. Curiel**

Date: April 11, 2025
Time: 1:30 p.m.
Courtroom: 2D

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ..................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ....................................2

III.  THIS COURT SHOULD COMPEL INDIVIDUAL ARBITRATION AND STAY THE ACTION PENDING COMPLETION OF THE ARBITRATION. ..............................................................................7

    A.    The Federal Arbitration Act Requires Enforcement Of Arbitration Agreements According To Their Terms. ......................................7

    B.    The RPA, Including Its Arbitration Provision, Is An Enforceable Contract. ...........................................................9

    C.    The Parties Clearly And Unmistakably Delegated To The Arbitrator Any Issues Of Arbitrability, Including Scope and Enforceability .......11

    D.    The Dispute Falls Within The Scope Of The RPA ...........................12

    E.    No Defense Exists to the Arbitration Agreement's Enforceability. ....13

    F.    The Military Lending Act's Provision Limiting Arbitration Does Not Apply Because Acima Does Not Extend "Credit." ..........................16

    G.    This Court Should Order Plaintiff To Arbitrate His Claims On an Individual Basis And Dismiss The Class Claims. ...............................20

    H.    Should the Court Find That the MLA Claim Is Not Subject to Arbitration, It Should Stay the Proceedings Pending Resolution of the TILA Claim in Arbitration. ..................................................21

IV.   CONCLUSION ................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*24 Hour Fitness, Inc. v. Superior Court*,
  66 Cal. App. 4th 1199 (1998) ................................................................ 16

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
  513 U.S. 265 (1995) .............................................................................. 7

*Ambler v. BT Ams. Inc.*,
  964 F. Supp. 2d 1169 (N.D. Cal. 2013) ................................................ 10

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
  24 Cal. 4th 83 (2000) ........................................................................ 8, 14

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) .............................................................................. 8

*B.D. v. Blizzard Ent., Inc.*,
  76 Cal. App. 5th 931 (2022) ................................................................. 10

*Baltazar v. Forever 21, Inc.*,
  62 Cal. 4th 1237 (2016) ......................................................................... 8

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) .............................................................. 9

*Camarillo v. Balboa Thrift & Loan Ass'n*,
  No. 3:20-cv-00913-BEN-BLM, 2021 WL 409726 (S.D. Cal. Feb. 4,
  2021) ..................................................................................................... 8

*Cape Flattery Ltd. v. Titan Mar., LLC*,
  647 F.3d 914 (9th Cir. 2011) ............................................................... 12

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
  207 F.3d 1126 (9th Cir. 2000) .............................................................. 10

*CMAX, Inc. v. Hall*,
  300 F.2d 265 (9th Cir. 1962) ............................................................... 22

*Consumer Financial Protection Bureau v. Snap Finance LLC*,
  No. 2:23-cv-00462, 2024 WL 3625007 (D. Utah, August 1, 2024)
  ...................................................................................................... 17, 18

*Davis v. Nordstrom, Inc.*,
  755 F.3d 1089 (9th Cir. 2014) ....................................................... 8, 9

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) ............................................................................ 8

*DIRECTV, Inc. v. Imburgia*,
  577 U.S. 47 (2015) .............................................................................. 9

*Dorton v. Kmart Corp.*,
  229 F. Supp. 3d 612 (E.D. Mich. 2017) ...................................... 17, 18

*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak St.*,
  35 Cal. 3d 312 (1983) ......................................................................... 8

*Evenskaas v. Cal. Transit, Inc.*,
  81 Cal. App. 5th 285 (2022), *review denied* (Oct. 19, 2022) ........... 219

*Fittante v. Palm Springs Motors, Inc.*,
  105 Cal. App. 4th 708 (2003) ........................................................... 14

*Fuller v. Rent-A-Ctr., Inc.*,
  No. CIV-20-00777-JD, 2020 WL 12772102 (W.D. Okla. Dec. 28, 2020) ........ 17

*Graham v. Scissor-Tail, Inc.*,
  28 Cal. 3d 807 (1981) ....................................................................... 13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) ......................................................................... 9

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ......................................................................... 17

*Iskanian v. CLS Transp. Los Angeles, LLC*,
  59 Cal. 4th 348 (2014), *abrogated on other grounds by Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), *reh'g denied* 143 S. Ct. 60 (2022) .................................................................................... 20, 21

*Johnmohammadi v. Bloomingdale's Inc.*,
  755 F.3d 1072 (9th Cir. 2014) ........................................................... 9

iv

*Kilgore v. KeyBank, N.A.*,
   718 F.3d 1052 (9th Cir. 2013) (*en banc*).............................................................. 8

*Kohler v. Whaleco, Inc.*,
   No. 24-cv-00935-AJB-DEB, 2024 WL 4887538 (S.D. Cal. Nov. 25, 2024)
   .............................................................................................................. 14, 15

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019) ............................................................................ 21

*Lane v. Francis Cap. Mgmt. LLC*,
   224 Cal. App. 4th 676 (2014)....................................................................... 8

*Liberty Leasing Co. v. Machamer*,
   6 F. Supp. 2d 714 (S.D. Ohio 1998)............................................................ 18

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ................................................................... 22

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ........................................................................... 17

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
   89 Cal. App. 4th 1042 (2001)..................................................................... 14

*Maul v. Aaron's, Inc.*,
   No. CIV-12-924-M, 2013 WL 12090304 (W.D. Okla. Mar. 19, 2013) ........... 17

*McNamara v. Royal Bank of Scotland Grp., PLC*,
   No. 11-cv-2137-L(WVG), 2012 WL 5392181 ................................................ 12

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir. 1983)..................................................................... 22

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ......................................................................... 9

*Mortensen v. Bresnan Commn's, LLC*,
   722 F.3d 1151 (9th Cir. 2013)..................................................................... 13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ............................................................................... 9, 12

MEMO ISO MOTION TO STAY IN FAVOR
OF ARBITRATION

*Nanavati v. Adecco USA, Inc.*,
  99 F. Supp. 3d 1072 (N.D. Cal. 2015)........................................................ 10

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
  724 F.3d 1069 (9th Cir. 2013) ................................................................... 12

*Pac. Corp. Grp. Holdings, LLC v. Keck*,
  232 Cal. App. 4th 294 (2014) .................................................................... 10

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,
  55 Cal. 4th 223 (2012) .............................................................................. 13

*Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*,
  862 F. 3d 981 (9th Cir. 2017) .................................................................... 11

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010), The FAA ...................................................................... 8

*Rogers v. Lyft, Inc.*,
  452 F. Supp. 3d 904 (N.D. Cal. 2020)....................................................... 21

*Romero v. Watkins & Shepard Trucking, Inc.*,
  No. 20- 55768, 2021 WL 3675074 (9th Cir. Aug. 19, 2021)...................... 10

*Sanchez v. Valencia Holding Co., LLC*,
  61 Cal. 4th 899 (2015) .............................................................................. 14

*Simula, Inc. v. Autoliv, Inc.*,
  175 F.3d 716 ............................................................................................. 12

*Sonic-Calabasas A, Inc. v. Moreno*,
  57 Cal. 4th 1109 (2013)............................................................................. 14

*Wilcox v. Ho-Wing Sit*,
  586 F. Supp. 561 (N.D. Cal. 1984)............................................................ 22

*Wolf v. Langemeier*,
  No. 2:09-CV-03086, 2010 WL 3341823 (E.D. Cal. Aug. 24, 2010)............ 22

**STATUTES**

9 U.S.C. § 2 .................................................................................................... 7

9 U.S.C. §§ 3–4 .............................................................................................. 8

MEMO ISO MOTION TO STAY IN FAVOR
OF ARBITRATION

10 U.S.C. § 987...............................................................................................16

10 U.S.C. § 987(i)(6) ......................................................................................19

10 U.S.C. §§ 987(e)(3), (f)(4) ........................................................................16

10 U.S.C. §§ 987(h)-(i)(6) ..............................................................................16

12 U.S.C. § 5481(7) ........................................................................................17

Cal. Civ. Code § 1812.60, *et seq.* (California's Karnette Act)..................................1

Cal. Civ. Proc. Code § 1280 *et seq.* ..............................................................8

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ......................................................8

## I.    **INTRODUCTION**

Plaintiff Gaberik Holm ("Plaintiff") is a customer of defendant Acima Digital, LLC (incorrectly named in the Complaint as Acima Credit Digital, LLC) ("Defendant" or "Acima"), one of the country's leading lease-to-own companies. Plaintiff and Acima (collectively, "the parties") entered into a short-term, renewable lease agreement specifically regulated by state law, called a Rental Purchase Agreement ("RPA"), whereby – as disclosed to Plaintiff -- Acima agreed to purchase eligible personal property selected by Plaintiff from a third-party retailer and then to rent that property to Plaintiff.  Under the express terms of the RPA, the transaction provided Plaintiff the flexibility to use and enjoy Acima's property pursuant to the RPA and elect whether to either acquire ownership through various ownership options or terminate the lease at any time without a penalty or any obligations for future rental payments. There is no loan of money or extension of credit involved in the transaction and no long-term obligation incurred. The RPA makes clear throughout that it is a lease agreement—and not a credit or finance arrangement—and embedded within the RPA is an arbitration provision (the "Arbitration Agreement") that requires Plaintiff to submit any claim against Acima to binding arbitration before the American Arbitration Association ("AAA").

Ignoring his obligation to submit his claim to arbitration, Plaintiff – less than two months after entering his RPA with Acima -- improperly filed this action, alleging violations of the Military Lending Act ("MLA") and Truth in Lending Act ("TILA") and seeking to bring his meritless claims on a class-wide basis.  While neither the MLA nor TILA applies to the Plaintiff's state-law governed lease transaction with Acima, this is not the proper forum to resolve the merits.[1]  Plaintiff is bound by the Arbitration Agreement he signed and is, therefore, precluded from litigating his claims in this Court.  To the extent that Plaintiff may seek to evade his

---

[1] *See, e.g.*, Cal. Civ. Code § 1812.60, *et seq.* (California's Karnette Act).

agreement to arbitrate this dispute by arguing that (1) Acima's well established Arbitration Agreement is somehow unconscionable, or (2) the RPA was a disguised credit agreement rather than a lease agreement despite explicit language to the contrary, those arguments fail.  Defendant respectfully requests that the Court enforce the Arbitration Agreement, dismiss the class claims which are expressly waived under the Arbitration Agreement, and stay these proceedings in favor of mandatory individual arbitration.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Acima is a lease-to-own company that provides consumers with the opportunity to obtain ownership of high-quality, name-brand household products and other durable goods under flexible, short-term lease-to-own agreements with no long-term obligation.  In a lease-to-own transaction, after a customer applies and is approved by Acima for a lease, Acima purchases from a third party retailer and takes ownership of the selected item.  The customer then executes a contract (the RPA) memorializing the lease-to-own transaction.  After execution of the RPA, Acima leases the product to the customer in exchange for the customer making lease renewal payments over short-term renewal periods each lasting a week to a month at the longest, and Acima will occasionally also provide associated or necessary accompanying services as part of that arrangement.

Plaintiff, who has alleged that he is an active-duty Corporal in the US Marines, entered into an RPA with Acima on August 31, 2024.  See Complaint at ¶¶ 12-13; Complaint Exhibit 1 (Rental Purchase Agreement).  Under the terms of the RPA, Acima agreed to purchase from a third-party retailer and lease to Plaintiff a new set of tires, along with the provision of associated services.[2]  Complaint

---

[2] Plaintiff has disingenuously characterized the RPA as wholly for services and not the lease of any property.  *See, e.g.,* Complaint ¶ 6 ("Acima's rent-to-own agreements made to Corporal Holm and other Covered Borrowers for one-time, contemporaneously performed services are a sham.  Corporal Holm will not 'own' the 'tire alignment' or 'labor for starter' at the end of the one-year purported lease

Exhibit 1 (Rental Purchase Agreement) at 4 (characterizing the "item(s) that are the subject matter of this Agreement" as the "**NEW TIRES**[,] **ALIGNMENT**[,] **AND LABOR FOR STARTER**"); Complaint Exhibit 2 (invoice from American Tire Depot showing an itemization of the purchases, which includes the purchase of four tires and associated labor costs). Plaintiff entered this agreement by applying for a lease with Acima and then signing the RPA on his mobile device, as detailed below. Ex. A (Declaration of Tyson Novakovich) at ¶¶ 2-4.

    Plaintiff first accessed an application for a lease with Acima from his mobile device after scanning a QR code located at a Tire Depot store. Ex. A (Declaration of Tyson Novakovich) at ¶ 3. As part of the application and signing process, Plaintiff had to encounter and interact with the following screen:

---

term with Acima Credit, because of course he won't: Simply put, there is *nothing to own*.") (emphasis in original); see also Complaint ¶¶ 42-45. Contrary to this allegation, there is in fact physical eligible personal property at issue—new tires—which Plaintiff took possession of and ultimately could own by making the requisite lease renewal payments or exercising an early purchase option as outlined in the RPA. *See, e.g.,* Complaint Ex. 2 (invoice from American Tire Depot showing, among other entries, that Acima purchased four tires).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## Why shop with Acima?

### ⊘ We're not a loan or credit card

With an Acima lease, you aren't buying today. Acima owns the leased item until you make all the lease renewal payments. If you do not use an early purchase option, you may pay more than double the retail price. You always have the option to purchase early and own it for less. You may also terminate your lease and return the item in good condition at any time without penalty. Estimate costs.

### 🐷 You can purchase early & save

You always have the flexibility of our "early purchase option." When you're ready, pay a lump sum and own immediately. The sooner you do, the more you save!

### ◎ Transparency with our retailers

We rely on our retailers to share information about Acima as an alternative to consumer credit options. Even though lease-to-own may cost more than credit offers available to you, our low payments and unmatched flexibility may be the right fit for your life and your budget. We sometimes incentivize our host retailers to increase awareness of our value proposition. Ask your salesperson about all of your credit and leasing options.



**Get Started**

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply

*Id.* Included on that screen, in bold, is the language **"We're not a loan or credit card"** and an additional warning that "[w]ith an Acima lease, you aren't buying today" because "Acima owns the leased item until you make all the lease renewal payments." The screen adds that "[y]ou may also terminate your lease and return the item in good condition at any time without penalty." Plaintiff was required to click the "Get Started" button at the bottom of the screen before he proceeded to sign the RPA, an agreement which Plaintiff has conceded he entered. Ex. A (Declaration of Tyson Novakovich) at ¶¶ 4; *see also* Complaint ¶ 4.

The RPA provides the terms of the lease agreement, whereby Acima agreed to purchase "new tires" and provide accompanying services as the lease's "Property," which Acima then leased to Plaintiff at the agreed-on terms. Complaint Ex. 1 at 3-6. The RPA makes explicit on several occasions that the underlying agreement is a lease—not a loan. The RPA refers to itself throughout the agreement as a "lease." Whereas the RPA uses the word "lease" ***72 times***, it never once states that it is a "loan" or provides "credit" or "financing" to Plaintiff. *See id.* generally. The RPA also states:

> This Agreement is a lease; a lease is a legal arrangement whereby the lessee/renter (you) agrees to pay the lessor/owner of the property (us) for use of the property for a specified period of time. You make Renewal Payments for the use of the Property for each renewal period only. You do not obtain ownership rights until you pay the Total of Payments plus all applicable taxes, or exercise an early purchase option.

*Id.* at 4. The RPA also requires Plaintiff to pay rent for his leased item in advance of each renewal period—unlike a credit arrangement—and it also gives Plaintiff the right to terminate his agreement at any time without penalty. *Id.* at 1, 4 ("You can terminate your lease at any time without penalty by returning the Property according to our directions, and by paying us any late Renewal Payments, plus Other Charges due.") ("Renewal Payments are made in advance.").

The RPA alerts Plaintiff that it contains an arbitration provision (characterized as its own "Arbitration Agreement" within the RPA), stating in bold:

> **THIS RENTAL-PURCHASE AGREEMENT CONTAINS AN ARBITRATION PROVISION (SEE ¶ 18 OF THE ADDITIONAL LEASE TERMS). UNLESS YOU PROMPTLY REJECT THE ARBITRATION PROVISION (SEE ¶ 18), THE ARBITRATION PROVISION WILL HAVE A SUBSTANTIAL EFFECT ON YOUR RIGHTS IN THE EVENT OF A DISPUTE, INCLUDING YOUR RIGHT TO BRING OR PARTICIPATE IN A CLASS PROCEEDING.**

*Id.* at 3. On the same page, the RPA also contains the following language (again in bold):

**BY SIGNING THIS AGREEMENT: (1) YOU AGREE TO ALL ITS TERMS, INCLUDING THE ADDITIONAL LEASE TERMS BELOW (SEE, IN PARTICULAR THE EFT AUTHORIZATION (¶ 14) AND ARBITRATION PROVISION (¶ 18)) AND (2) YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT.**

*Id*. The arbitration provision is included as its own section of the RPA and Plaintiff's signature appears directly below it. See *id*. at 10. The provision states:

> Except as otherwise provided in this Agreement, you and the Company agree to resolve by individual, final, and binding arbitration any and all claims or controversies, past, present, or future, that the Company may have against you or that you may have against the Company and/or (i) its directors, officers, members, managers, employees, or agents in their capacity as such or otherwise; (ii) its successors or assigns; and (iii) its clients and host stores, in accordance with the terms and procedures set forth in this Agreement.

*Id*. at 7. The arbitration provision further elaborates:

> Claims and disputes subject to arbitration include but are not limited to … • claims arising under, arising out of, or relating in any way to any Consumer Contract entered into between you and the Company at any time and/or any services rendered under or that relate to any such Consumer Contract; … [and] except as specified in the Class Action Waiver below, any and all disputes relating to the interpretation, applicability, enforceability, scope, waiver, or formation of this Agreement, including but not limited to any contention that all or any part of this Agreement is void or voidable.

*Id*. The provision also gives Plaintiff the "**Right to Reject**" the arbitration agreement via a mailed written rejection notice within 15 days of signing the RPA. *Id*. Plaintiff never invoked his right to reject the arbitration provision. Ex. A (Declaration of Tyson Novakovich) at ¶ 5. Finally, the arbitration provision includes a "Class Action Waiver" clause, under which the parties agreed that "[t]here will be no right or authority for any dispute to be brought, heard, or arbitrated as a class, mass, or representative action or for the Arbitrator to award declaratory or injunctive relief on behalf of absent parties." *Id*.

On October 23, 2024, less than two months after entering the RPA with Acima, Plaintiff filed a complaint against Acima in the Superior Court of the State

of California for the County of San Diego alleging violations of the Truth in Lending Act ("TILA") and Military Lending Act ("MLA") and seeking to represent a class of individuals for each claim. In that complaint, Plaintiff consistently characterized the RPA as a "loan" (even self-servingly re-labeling the agreement as the "Loan Agreement") despite the RPA's unequivocal language otherwise. On December 16, 2024, Acima timely removed the action to this Court.

## III.  THIS COURT SHOULD COMPEL INDIVIDUAL ARBITRATION AND STAY THE ACTION PENDING COMPLETION OF THE ARBITRATION.

The Arbitration Agreement is legally binding and covers the claims here asserted. This Court should therefore compel Plaintiff to arbitrate his individual claims, dismiss the class claims, and stay this action pending completion of the arbitration.

### A.  The Federal Arbitration Act Requires Enforcement Of Arbitration Agreements According To Their Terms.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*,[3] permits a party to a written arbitration agreement to petition for an order compelling the parties to arbitrate. In relevant part, the FAA provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil

---

[3] The FAA requires only a minimal nexus to interstate commerce. The United States Supreme Court has interpreted the FAA's test — "involving commerce," 9 U.S.C. § 2—as words of art that signal the broadest permissible exercise of Congress' Commerce Clause power. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 274-77 (1995) (applying the FAA to a termite-extermination contract applicable to one single-family home). Acima manifestly is engaged in interstate commerce, and the Agreement specifically acknowledges that Plaintiff "understand[s] and agree[s] that the Company is engaged in transactions involving interstate commerce and that the Federal Arbitration Act therefore governs this agreement." Complaint Exhibit 1 (Rental Purchase Agreement) at 9.

> action or in admiralty of the subject matter of a suit arising out
> of the controversy between the parties, for an order directing
> that such arbitration proceed in the manner provided for in such
> agreement.

*Id.* § 4. Indeed, under the FAA, a federal court "*shall* . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement," and "*shall*" compel the parties into arbitration. 9 U.S.C. §§ 3–4 (emphases added); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010). [4] It follows that courts have the authority to stay such actions under Section 3 of the FAA or Federal Rule of Civil Procedure 12(b)(1). *Camarillo v. Balboa Thrift & Loan Ass'n*, No. 3:20-cv-00913-BEN-BLM, 2021 WL 409726, at *13 (S.D. Cal. Feb. 4, 2021).

The FAA "reflects a 'liberal federal policy' in favor of arbitration." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014) (*quoting AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 346 (2011)). Accordingly, "[u]nder the FAA, the role of the district court is to determine if a valid arbitration agreement exists, and if so, whether the agreement encompasses the dispute at issue." *Id.* (*citing Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1057-58 (9th Cir. 2013) (*en banc*)). Where a dispute falls within the scope of a valid agreement to arbitrate, the FAA requires the district court to direct the parties to arbitrate. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). There is a strong federal policy favoring

---

[4] The FAA applies here, but California state law, Cal. Civ. Proc. Code § 1280 *et seq.*, produces the same result. *See, e.g., Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1247 n.3 (2016) (enforcing agreement under state law even though FAA coverage was disputed); *Lane v. Francis Cap. Mgmt. LLC*, 224 Cal. App. 4th 676, 688-93 (2014) (same). The California Supreme Court has long recognized "this state's strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution." *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak St.*, 35 Cal. 3d 312, 322 (1983). In *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000), the California Supreme Court reiterated: "California law, like federal law, favors enforcement of valid arbitration agreements. . . . California courts and its Legislature have 'consistently reflected a friendly policy toward the arbitration process.'" *Id.* at 97 (citations omitted).

1   arbitration; thus, the FAA "establishes that, as a matter of federal law, any doubts

2   concerning the scope of arbitrable issues should be resolved in favor of arbitration."

3   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

4   These same principles extend to the enforceability of class action waivers; when the

5   agreement waives pursuit of claims on a classwide basis, federal courts must

6   enforce those waivers under the FAA. *See Concepcion*, 563 U.S. at 351–52; *see*

7   *also Johnmohammadi v. Bloomingdale's Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014)

8   ("[Plaintiff] can't argue that the class-action waiver is unenforceable under

9   California law." (citing *Concepcion*, 563 U.S. at 346–48)).

10   Moreover, where (as here) the parties delegate to the arbitrator the power to

11   decide gateway arbitrability issues—such as the scope and enforceability of the

12   arbitration agreement—the district court's inquiry is even more limited. "[I]f a valid

13   agreement exists, and if the agreement delegates the arbitrability issue to an

14   arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v.*

15   *Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). To determine whether there

16   is a valid delegation, the court undertakes a limited inquiry into whether the parties

17   "clearly and unmistakably" delegated the power to decide arbitrability to the

18   arbitrator. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

19   **B.    The RPA, Including Its Arbitration Provision, Is An Enforceable**

20   **Contract.**

21   When determining whether a valid contract to arbitrate exists, a federal court

22   "appl[ies] ordinary state-law principles that govern the formation of contracts."

23   *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 62 (2015) (reversing a California state

24   court that had failed to do so) (*citing First Options of Chicago, Inc. v. Kaplan*, 514

25   U.S. 938, 944 (1995)); *see also Davis*, 755 F.3d at 1093 (*citing Ferguson v.*

26   *Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)).  To form a

27   contract under California law, "there must be [m]utual manifestation of assent."

28   *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation

marks omitted) (applying California law). Arbitration agreements are presumed to be valid; the party seeking to avoid arbitration bears the burden of demonstrating otherwise. *See, e.g.*, *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *Ambler v. BT Ams. Inc.*, 964 F. Supp. 2d 1169, 1174 (N.D. Cal. 2013).

Plaintiff and Acima mutually assented to be bound by the RPA and its arbitration provision. "The manifestation of mutual consent is generally achieved through the process of offer and acceptance . . . [and] is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Pac. Corp. Grp. Holdings, LLC v. Keck*, 232 Cal. App. 4th 294, 309 (2014) (internal citations and quotation marks omitted). "If an offeree objectively manifests assent to an agreement, the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it." *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 943 (2022). Here, Plaintiff willingly signed the RPA electronically and therefore objectively manifested assent to its terms, including the Arbitration Agreement. *See Romero v. Watkins & Shepard Trucking, Inc.*, No. 20- 55768, 2021 WL 3675074, at *1 (9th Cir. Aug. 19, 2021) (finding parties formed agreement to arbitrate based on evidence that plaintiff electronically signed arbitration agreement); *Nanavati v. Adecco USA, Inc.*, 99 F. Supp. 3d 1072, 1076 (N.D. Cal. 2015) (same). Prior to signing, Plaintiff had to click through several screens and scroll through the entire RPA. The RPA made clear with conspicuous text in several locations that it included an arbitration provision, and Plaintiff affixed his signature in several different locations on the RPA including just below the Arbitration Agreement. Plaintiff therefore consented to the RPA, including the Arbitration Agreement, making it an enforceable contract.

### C.     The Parties Clearly And Unmistakably Delegated To The Arbitrator Any Issues Of Arbitrability, Including Scope and Enforceability.

The Arbitration Agreement unmistakably delegates questions of its scope and enforceability to the arbitrator.  It provides that "[c]laims and disputes subject to arbitration include but are not limited to … any and all disputes relating to the interpretation, applicability, enforceability, scope, waiver, or formation of this Agreement, including but not limited to any contention that all or any part of this Agreement is void or voidable."  Complaint Exhibit 1 at  7.  Because this clause covers the "applicability" and "enforceability" of the Arbitration Agreement and involves "any contention that all of any part of this Agreement is void or voidable," it delegates both the decision as to whether the dispute falls within the scope of the Arbitration Agreement as well as the decision as to whether the Arbitration Agreement is enforceable to the arbitrator.

Accordingly, to the extent Plaintiff intends to challenge the scope or enforceability of the parties' Arbitration Agreement, such issues are clearly and unmistakably delegated to the arbitrator and arbitration is the proper forum to address them. *See Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F. 3d 981, 985–86 (9th Cir. 2017) (finding that the district court erred by enjoining arbitration under the FAA and by preventing the arbitrator from addressing the scope of arbitration when parties delegated such authority to the arbitrator).[5]

---

[5] The parties also clearly and unmistakably delegated authority to the arbitrator by incorporating the AAA Rules. The Arbitration Agreement states, in relevant part, that "[t]he arbitration will be administered by the AAA and, except as provided in this Agreement, shall proceed in accordance with the AAA's Consumer Arbitration Rules ('AAA Rules') in effect at the time the arbitration commences."  Complaint Exhibit 1  8.  According to R-14(a) of the AAA Rules, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  For the reason, "[v]irtually every

### D.    The Dispute Falls Within The Scope Of The RPA.

Even if the Court were to reach the question whether the dispute falls within the scope of the RPA, the Arbitration Agreement plainly covers Plaintiff's claims. Because the FAA reflects a "liberal federal policy favoring arbitration agreements," the Supreme Court has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus, "[e]nforcement of an arbitration agreement 'should not be denied unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *McNamara v. Royal Bank of Scotland Grp., PLC*, No. 11-cv-2137-L(WVG), 2012 WL 5392181, at *3 (quoting *AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

The Arbitration Agreement states that "[c]laims and disputes subject to arbitration include but are not limited to … claims arising under, arising out of, or relating in any way to any Consumer Contract entered into between you and the Company at any time and/or any services rendered under or that relate to any such Consumer Contract; … [and] claims that are based on any legal theory whatsoever, including negligence, breach of contract, tort, fraud, misrepresentation, trespass, the common law, or any statute, regulation, or ordinance."  Complaint Ex. 1 at  7.  It is well-established that arbitration agreements that include "relating to" language, like this one, are broad in scope. *See, e.g., Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922 (9th Cir. 2011) (explaining that "broad arbitration provision[s]" with language such as "arising out of or relating to" demonstrate an intention to cover a broader scope of disputes); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721-723

---

circuit to have considered the issue"—including the Ninth Circuit—"has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013).

(explaining that "[e]very court that has construed the phrase 'arising in connection
with' in an arbitration clause has interpreted that language broadly").  Because
Plaintiff's claims rely entirely on the terms of the RPA and Acima's alleged failure
to provide proper disclosures under the MLA and TILA (which do not apply to
Acima's state-law governed RPAs), the lawsuit involves claims that both "aris[e]
out of" the RPA and are "based on any legal theory whatsoever" including those
arising under "any statute, regulation, or ordinance" (in this case, the MLA and the
TILA).  Any reasonable consumer reviewing the Arbitration Agreement would
understand that it covers disputes such as this one.  The dispute therefore falls
within the scope of the Arbitration Agreement.

### E.    No Defense Exists to the Arbitration Agreement's Enforceability.

Similarly, even if the Court were to determine that the parties did not
delegate to the arbitrator the enforceability of the Arbitration Agreement, any
challenges relating to the enforceability of the agreement would fail.  "The [FAA]
makes an agreement to arbitrate 'valid, irrevocable, and enforceable…save upon
such grounds as exist at law or in equity for the revocation of any contract.'"
*Kilgore*, 718 F.3d at 1057-58 (quoting 9 U.S.C. § 2). This "savings clause" of the
FAA "preserves generally applicable contract defenses, such as fraud, duress, or
unconscionability." *Mortensen v. Bresnan Commn's, LLC*, 722 F.3d 1151, 1158
(9th Cir. 2013).  But none of those arguments applies here—indeed, Plaintiff has
not even alleged that any of those defenses applies.  However, to the extent the
Plaintiff now seeks to raise a claim of unconscionability, it would be frivolous.

Unconscionability is an affirmative defense to the enforcement of a contract.
*Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 820 (1981).  "The party resisting
arbitration bears the burden of proving unconscionability." *Pinnacle Museum
Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 247 (2012).

Unconscionability has both a substantive and a procedural element.  An
agreement to arbitrate is unenforceable only where both substantive and procedural

1  unconscionability exist; it is not enough that one may exist without the other. *See,*

2  *e.g.*, *Armendariz*, 24 Cal. 4th at 114 (both forms of unconscionability must be

3  present to defeat contract formation); *Fittante v. Palm Springs Motors, Inc.*, 105

4  Cal. App. 4th 708, 723 (2003) (same). "'With a concept as nebulous as

5  "unconscionability," it is important that courts not be thrust in the paternalistic role

6  of intervening to change contractual terms that the parties have agreed to merely

7  because the court believes the terms are unreasonable.'" *Marin Storage &*

8  *Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1055

9  (2001) (*quoting American Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1391

10  (1996)). As the California Supreme Court reiterated, "The unconscionability

11  inquiry is not a license for courts to impose their renditions of an ideal arbitral

12  scheme." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1148 (2013).

13  "[C]ourts may not decline to enforce an arbitration agreement simply on the ground

14  that it appears to be a bad bargain or that one party could have done better." *Id.*;

15  *accord Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015) ("A

16  party cannot avoid a contractual obligation merely by complaining that the deal, in

17  retrospect, was unfair or a bad bargain."). As shown below, the Arbitration

18  Agreement is neither procedurally, nor substantively, unconscionable, and certainly

19  not both.

20          As an initial matter, the Arbitration Agreement is not procedurally

21  unconscionable. "Procedural unconscionability measures the degree of oppression

22  or surprise during contract formation." *Kohler v. Whaleco, Inc.*, No. 24-cv-00935-

23  AJB-DEB, 2024 WL 4887538, at *7 (S.D. Cal. Nov. 25, 2024) (internal quotation

24  marks omitted). Oppression "arises from an inequality of bargaining power that

25  results in no real negotiation and an absence of meaningful choice" whereas

26  "[s]urprise involves the extent to which the supposedly agreed-upon terms are

27  hidden in a prolix printed form drafted by the party seeking to enforce them." *Id.*

28  Here, there is neither oppression nor surprise. There is no oppression because

Plaintiff had the ability to opt out of the Arbitration Agreement via the Arbitration Agreement's "Right to Reject" clause, which gave Plaintiff 15 days from the signing of the agreement to mail Acima a written rejection of the Arbitration Agreement.  See Complaint Ex. 1 at 7.  Nor is there "surprise," as the Arbitration Agreement was not buried within the terms of service or otherwise hidden.  Far from it—the Arbitration Agreement was prominently presented within the RPA— the entirety of which Plaintiff was required to scroll through before affixing his signature (see Ex. A (Declaration of Tyson Novakovich) at ¶ 5.) —which also contains numerous conspicuous notifications of its arbitration provision, including the following bold language on the third page of the agreement:

**THIS RENTAL-PURCHASE AGREEMENT CONTAINS AN ARBITRATION PROVISION (SEE ¶ 18 OF THE ADDITIONAL LEASE TERMS). UNLESS YOU PROMPTLY REJECT THE ARBITRATION PROVISION (SEE ¶ 18), THE ARBITRATION PROVISION WILL HAVE A SUBSTANTIAL EFFECT ON YOUR RIGHTS IN THE EVENT OF A DISPUTE, INCLUDING YOUR RIGHT TO BRING OR PARTICIPATE IN A CLASS PROCEEDING.**

The RPA therefore explicitly notifies users of the Arbitration Agreement, as well as the opportunity to opt-out, nullifying any concern of undue surprise.

Nor is the Arbitration Agreement substantively unconscionable. "Substantive unconscionability examines the fairness of a contract's terms." *Lim*, 8 F.4th at 1001 (quoting *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 129 (2019)). "[T]he standard for substantive unconscionability—the requisite degree of unfairness beyond merely a bad bargain—must be as rigorous and demanding for arbitration clauses as for any contract clause." *Kohler v. Whaleco, Inc.*, 2024 WL 4887538, at *8 , quoting *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 912 (2015). Nothing about Acima's Arbitration Agreement is "unfair."  The agreement applies to both parties in equal force and therefore binds both parties alike to submit their claims to arbitration, subject to the same rules and procedures and the same advantages and disadvantages.  This defeats any claim of substantive

1  unconscionability.  *See 24 Hour Fitness, Inc. v. Superior Court,* 66 Cal. App. 4th

2  1199 (1998) (no substantive unconscionability where the arbitration provision

3  applied equally to employer and employee).  Accordingly, any claim that the

4  Arbitration Agreement is unconscionable is invalid.

5          F.  **The Military Lending Act's Provision Limiting Arbitration Does**

6          **Not Apply Because Acima Does Not Extend "Credit."**

7        The MLA governs extensions of "consumer credit" to covered members of

8  the armed forces and their dependents and seeks to provide protections against

9  predatory lending practices by imposing limitations on the cost and terms of credit

10  products. *See* 10 U.S.C. § 987; 32 C.F.R. § 232.1(b). In addition to capping interest

11  rates and requiring certain disclosures, the MLA makes it "unlawful for any creditor

12  to extend consumer credit to a covered member ... with respect to which the creditor

13  requires the borrower to submit to arbitration" and provides that "no agreement to

14  arbitrate any dispute involving the extension of consumer credit shall be

15  enforceable against ... any person who was a covered member ... when the

16  agreement was made." 10 U.S.C. §§ 987(e)(3), (f)(4).  The statute, however, does

17  not define "consumer credit," instead delegating that task to the Department of

18  Defense ("DoD"), except to say that the definition shall not include a "residential

19  mortgage" or "a loan procured in the course of purchasing a car or other personal

20  property, when that loan is offered for the express purpose of financing the

21  purchase and is secured by the car or personal property procured." 10 U.S.C. §§

22  987(h)-(i)(6).  The DoD, in turn, has defined "consumer credit" as "credit offered or

23  extended to a covered borrower primarily for personal, family, or household

24  purposes, and that is (i) subject to a finance charge or (ii) payable by a written

25  agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).  The DoD has

26  also defined "credit" as "the right granted to a consumer by a creditor to defer

27  payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h).

28

1    "When the meaning of a statute [is] at issue," the judiciary role was to  "to

2    interpret the act of Congress, in order to ascertain the rights of the parties."  *Loper*

3    *Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024) (citation omitted).  That

4    "analysis begins with 'the language of the statute,'" and if "the statutory language

5    provides a clear answer, it ends there as well."  *Hughes Aircraft Co. v. Jacobson*,

6    525 U.S. 432, 438 (1999) (citations omitted).  "The text of the [statute] means what

7    it says."  *Loper Bright*, 144 S. Ct. at 2262.  Here, the statute and its accompanying

8    regulation define the meaning of the term "credit" in a way that excludes lease-to-

9    own transactions, such as the one at issue here.

10    Courts interpreting the definition of "credit" in a variety of contexts have

11    held uniformly that lease-to-own transactions are excluded from the scope of the

12    statutory term.  For example, in the context of the Consumer Financial Protection

13    Act (the "CFPA"), which defines "credit" as "the right granted by a person to a

14    consumer to [1] defer payment of a debt, [2] incur debt and defer its payment, or [3]

15    purchase property or services and defer payment for such purchase," 12 U.S.C.

16    § 5481(7), the District of Utah recently reaffirmed that lease-to-own transactions

17    "do[] not meet the statutory definition of credit under the CPFA because [they] did

18    not give consumers any right to defer the payment of debt, incur debt and defer its

19    payment, or purchase goods or services and defer payment therefor."  *Consumer*

20    *Financial Protection Bureau v. Snap Finance LLC*, No. 2:23-cv-00462, 2024 WL

21    3625007, at *14 (D. Utah, August 1, 2024).  In other contexts, courts also have held

22    consistently over time that lease-to-own transactions do not create credit

23    obligations.  *See, e.g.*, *Fuller v. Rent-A-Ctr., Inc.*, No. CIV-20-00777-JD, 2020 WL

24    12772102, at *3 (W.D. Okla. Dec. 28, 2020) (dismissing, for failure to state a

25    claim, the allegation that a lease-to-own transaction "would qualify as a credit

26    transaction under the ECOA [Equal Credit Opportunity Act]"); *Maul v. Aaron's,*

27    *Inc.*, No. CIV-12-924-M, 2013 WL 12090304, at *3 (W.D. Okla. Mar. 19, 2013)

28    (same); *Dorton v. Kmart Corp.*, 229 F. Supp. 3d 612, 625 (E.D. Mich. 2017)

(same); *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717, 719 (S.D. Ohio 1998) (same).

Moreover, by its very terms, the RPA did not cause Plaintiff to "incur debt" or "defer its payment." 32 C.F.R. § 232.3(h). The RPA required Plaintiff to pay for his lease item *in advance* of each lease renewal period. See Complaint Exhibit 1 at 4 ("Renewal Payments are made in advance."). Plaintiff also expressly retained the contractual right to terminate his agreement at any time without penalty. Complaint Ex. 1 at 7. Because the RPA required Plaintiff to make payments "in advance," Plaintiff did not incur "debt" that he had to pay off in the future. Instead, as with any lease, he paid for the contemporaneous use of the leased property (as well as accompanying services) and had no obligation to make future payments unless and until he renewed the lease term, at which point he could make the additional lease renewal payment in full. Such an arrangement does not constitute credit. *See Snap*, 2024 WL 3625007, at *7 (lease-to-own agreements did not extend credit where they "provided for substantially contemporaneous exchange of value[,]" "[c]onsumers paid for 60-day periods of possession of the leased property[,]" and "[u]pon executing the legacy lease, consumers did not bind themselves 'in all circumstances' to pay the total lease amount") (quoting *Machamer*, 6 F. Supp. 2d at 717); *see also Dorton*, 229 F. Supp. 3d at 625 (lease-to-own transactions are not credit because they are "payments made as a 'contemporaneous exchange of consideration for the right of *possession* and *use* of the equipment'") (quoting *Machamer*, 6 F. Supp. 2d at 717). Thus, Acima's lease-to-own transaction with Plaintiff does not meet the definition of "credit."

Nor does the RPA enable Plaintiff to purchase property and defer payment for such purchase. Under the express terms of the RPA, Acima maintains ownership of the property at all times and relinquishes ownership only upon full payment by the Plaintiff to acquire ownership of the property from Acima under the lease terms by virtue of the Plaintiff's exercise of an early purchase option or

completion of all lease renewal payments after renewal of the RPA for a specified number of lease terms. *Id.* at 4 ("**Ownership and Nature of Agreement:** WE OWN THE PROPERTY. This Agreement is a lease; a lease is a legal arrangement whereby the lessee/renter (you) agrees to pay the lessor/owner of the property (us) for use of the property for a specified period of time. You make Renewal Payments for the use of the Property for each renewal period only. You do not obtain ownership rights until you pay the Total of Payments plus all applicable taxes, or exercise an early purchase option."). The RPA expressly states that ownership does not transfer to the customer unless and until all optional lease renewal payments are made in full; merely making some (but not all) of the minimum periodic lease renewal payments does not result in the customer owning the product. *Id.* at 3 ("Total of Payments . . . . You must pay this amount to own the property[.]").[6]

---

[6] Even if the arrangement were somehow considered "credit"—it is not, for the reasons noted herein—Acima's arrangement with Plaintiff would nevertheless still fall under an exception from the definition of "consumer credit" contained in the MLA. The MLA excludes from the definition of "consumer credit" "a loan procured in the course of purchasing a car or personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured." 10 U.S.C. § 987(i)(6). Assuming for the sake of argument that Plaintiff were correct that the RPA was somehow a loan notwithstanding express language in the RPA to the contrary, then the transaction would be, for all practical purposes, a loan for the purpose of purchasing a set of tires (along with accompanying services) that would be secured by the tires themselves. Unsurprisingly, the RPA does not refer to a "security interest" because it is a lease transaction, not a credit transaction. But the RPA provides Acima the right to repossess the property if Plaintiff breaches the agreement. See Complaint Exhibit 1  5 ("**Right of Repossession:** If this Agreement terminates due to your breach of the Agreement, and you fail to return the Property, we have the right to repossess the Property.")] This right of repossession in the context of a lease transaction would, if Plaintiffs were correct (which they are not) be functionally equivalent to a security interest in a loan transaction. As a result, even if the RPA were deemed a credit transaction (again, it is not) for purposes of this analysis, it would nonetheless be subject to the MLA statutory exclusion from the definition of "consumer credit" under 10 U.S.C. § 987(i)(6).

1

2      Accordingly, the agreement between Plaintiff and Acima is not a "credit"

3   arrangement under the MLA, and therefore the MLA's prohibition on the

4   enforcement of arbitration agreements does not apply.

5       **G.**    **This Court Should Order Plaintiff To Arbitrate His Claims On an**

6              **Individual Basis And Dismiss The Class Claims.**

7      Plaintiff purports to assert class claims, but the Court should compel

8   arbitration on an individual basis.  The Agreement here expressly waives class

9   actions, and the waiver is enforceable.  Specifically, the Agreement states that

10   Plaintiff agreed to litigate on an individual basis only, and not in a class or

11   collective basis, as follows:

12        You and the Company agree that arbitration shall be conducted on an
         individual basis only. There will be no right or authority for any dispute to be
13        brought, heard, or arbitrated as a class, mass, or representative action or for
         the Arbitrator to award declaratory or injunctive relief on behalf of absent
14        parties ("Class Action Waiver").
15

16   Complaint Exhibit 1 at  8.

17      It is well settled that class action waivers must be upheld in arbitration

18   agreements.  In *Concepcion*, the United States Supreme Court held that federal law

19   preempted a California doctrine that deemed unenforceable a class-action waiver in

20   an arbitration agreement.  The reason is that class arbitration "sacrifices the

21   principal advantage of arbitration," is "poorly suited to the higher stakes of class

22   litigation," forces defendants to "bet the company with no effective means of

23   review," and is "not arbitration as envisioned by the FAA."  *Concepcion*, 563 U.S.

24   at 348, 350, 351.  The Supreme Court held that California must enforce arbitration

25   agreements even if the claimant must arbitrate claims individually, instead of on a

26   class basis.  California cases are in accord.  *See*, *e.g.*, *Iskanian v. CLS Transp. Los*

27   *Angeles, LLC*, 59 Cal. 4th 348, 366 (2014) (upholding class action waiver because

28   "*Concepcion* held that the FAA does prevent states from mandating or promoting

procedures incompatible with arbitration"), *abrogated on other grounds by Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), *reh'g denied* 143 S. Ct. 60 (2022); *Evenskaas v. Cal. Transit, Inc*., 81 Cal. App. 5th 285, 297-98 (2022), *review denied* (Oct. 19, 2022) (reversing trial court's order finding class action waiver unenforceable in light of *Conception* and *Iskanian*); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412 (2019) (even agreements silent or "ambiguous" about class action waivers cannot be read to allow class actions).

Because the Arbitration Agreement contains an express waiver of class or collective arbitration, the Court must compel Plaintiff to arbitrate his claims on an individual basis.  Moreover, because Plaintiff cannot bring class claims, his class action claims should be stricken.  *See Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 918 (N.D. Cal. 2020) (striking class claims because plaintiffs waived right to represent a class in any forum).

**H.**    **Should the Court Find That the MLA Claim Is Not Subject to Arbitration, It Should Stay the Proceedings Pending Resolution of the TILA Claim in Arbitration.**

Should the Court find that the Plaintiff's MLA claim cannot proceed to arbitration because the RPA was a "credit" agreement as understood by the MLA, the Court nevertheless must allow the Plaintiff's TILA claim to proceed to arbitration because there is no provision under TILA prohibiting disputes arising under TILA to proceed to arbitration.  As a result, if the Court were to accept Plaintiff's argument that the RPA was a loan notwithstanding express language in the agreement stating that it is a lease, the Court should (1) compel Plaintiff to arbitrate his TILA claim, and (2) stay the adjudication of his MLA claim in this Court pending the resolution of the hisTILA claim in arbitration.

Where plaintiffs assert both arbitrable and nonarbitrable claims, courts have "discretion whether to proceed with nonarbitrable claims before or after the arbitration and [have] . . . authority to stay proceedings in the interest of saving time

and effort for itself and litigants." *Wilcox v. Ho-Wing Sit*, 586 F. Supp. 561, 567
(N.D. Cal. 1984). "Where it is proposed that a pending proceeding be stayed, the
competing interests which are affected by the granting or refusal to grant a stay
must be weighed." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962); *see also
Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (applying *CMAX*
standard). ").

        "In deciding whether to stay non-arbitrable claims, a court considers
economy and efficiency, the similarity of the issues of law and fact to those that
will be considered during arbitration, and the potential for inconsistent findings
absent a stay." *Wolf v. Langemeier*, No. 2:09-CV-03086, 2010 WL 3341823, at *8
(E.D. Cal. Aug. 24, 2010) (citation omitted). Here, each of those factors favors
staying the adjudication of any non-arbitrable claim. Economy and efficiency favor
a stay because it avoids duplicative discovery and places the initial burden
regarding managing the case on the arbitrators rather than on the federal court
system. The claims, which both involve alleged failures to issue proper disclosures
under federal statutes, involve similar issues of law and fact and thus allowing the
arbitration to proceed first may benefit the Court. Finally, allowing the arbitration
to proceed first may avoid the potential for inconsistent findings by giving the
Court the benefit of seeing the arbitrators' ruling. *See Wilcox*, 586 F. Supp. at 568
(granting stay where arbitrator's decision was likely "to decide issues that will, at
least, streamline subsequent proceedings" before the court); *Mediterranean Enters.,
Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (affirming district
court's decision to stay lawsuit pending an arbitration that "might well decide issues
which bear in some way on the court's ultimate disposition" of nonarbitrable
claims).

        Accordingly, should the Court find that the TILA claim should proceed to
arbitration but the MLA claim should not, it should compel arbitration of his TILA

1  claim and stay further proceedings in this Court related to his MLA claim pending

2  the arbitration.

3  **IV.    <u>CONCLUSION</u>**

4        Plaintiff promised – less than two months before bringing this meritless

5  litigation -- to arbitrate all disputes he might have with Acima (and vice versa).  To

6  the extent Plaintiff now seeks to avoid his clear agreement to arbitrate, then it is for

7  an arbitrator to decide the applicability and enforceability of the Arbitration

8  Agreement.  Plaintiff's claims in this case are covered by the Arbitration

9  Agreement and must be arbitrated, and, because the Arbitration Agreement

10  expressly precludes class actions, Plaintiff must be compelled to arbitrate on an

11  individual basis and the class claims must be dismissed or stricken.  Accordingly,

12  this Court should order Plaintiff to submit his individual claims to arbitration

13  pursuant to the agreement, dismiss the class claims, and stay this civil action

14  pending completion of the arbitration.

15  DATED:  January 7, 2025          PAUL HASTINGS LLP

16

17  MATTHEW PREVIN        By: */s/ Christopher H. McGrath*
   matthewprevin@paulhastings.com     CHRISTOPHER H. MCGRATH

18  BRADLEY J. BONDI          (SB #149129)
   bradbondi@paulhastings.com       **Paul Hastings LLP**

19  MICHAEL MORRILL         4655 Executive Drive, Suite 350
   michaelmorrill@paulhastings.com    San Diego, CA 92121

20  **Paul Hastings LLP**          Telephone: (858) 458-3000
   200 Park Avenue           Facsimile: (858) 458-3005

21  New York, New York 10166
   Telephone: (212) 318-6000

22                       *Attorneys for Defendant*
                     *Acima Digital, LLC*

23

24

25

26

27

28